**GIRARD FINANCE COMPANY and Thomas Richter, Petitioners**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 4, 2012.

Decided July 27, 2012.

Reargument Denied Sept. 13, 2012.

---

524

Mark S. Halpern, Drexel Hill, for petitioners.

Charles L. Nier, III, Assistant Chief Counsel, Philadelphia, for respondent.

BEFORE: LEADBETTER, Judge, and COVEY, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COVEY.

Girard Finance Company (Girard Finance) and Thomas Richter (Richter) appeal from the Pennsylvania Human Relations Commission's (PHRC) October 24, 2011 Final Order requiring Girard Finance and Richter to cease and desist from unlawfully discriminating against Kevin Harris (Harris) and others because of their race and/or national origin; directing Girard Finance and Richter to pay various money damages to Harris and each of the similarly situated individuals; directing Girard Finance and Richter to each pay a civil penalty; directing Girard Finance to provide its employees with training regarding non-discriminatory practices; directing Girard Finance to develop and implement a recording system to track all of its transactions; and directing Girard Finance and Richter to report to the PHRC the means by which it will comply with the order. There are five issues before the Court: (1) whether the PHRC erred as a matter of law when it asserted its legal authority and jurisdiction over commercial loans made to corporate tavern owners; (2) whether Harris and the other similarly situated Claimants had standing to bring this claim under the Pennsylvania Human Relations Act (PHRA);[1] (3) whether certain claims were barred by the statute of limitations; (4) whether the PHRC proved that the loans at issue were predatory and/or the PHRC proved racial discrimination in Girard Finance's lending practices; and (5) whether the PHRC erred as a matter of law in awarding damages for which there was no record evidence, let alone the required substantial evidence.

On or about January 10, 2005, Harris filed a verified complaint[2] with the PHRC on behalf of himself and other similarly situated persons.[3] Harris alleged that Girard Finance unlawfully discriminated against him and other similarly situated persons on account of their race in the terms and conditions of loans of money and in the terms and conditions of real estate-related transactions.[4] Public hearings in this matter were convened before Permanent Hearing Examiner Phillip A. Ayers (PHE Ayers) on April 23–25, April 30, May 1, June 4, and July 14–16, 2008. On or about February 22, 2008, Girard Finance and Richter filed a Motion for Summary Judgment. On April 10, 2008, an Interlocutory Order was issued denying the summary judgment motion. On May 27, 2011, PHE Ayers held an additional day of hearing. On August 11, 2011, PHE Ayers found that Harris and other similarly situated persons had proven unlawful discrimination in violation of Sections 5(h)(1) and (4) of the PHRA.[5] On October 24, 2011, a Final Order was entered adopting and incorporating PHE Ayers' findings of fact, conclusions of law, opinion and

1. Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963.

2. Permanent Hearing Examiner Phillip A. Ayers stated in his opinion that the complaint was filed January 9, 2006, however the docket entries indicate it was filed on January 10, 2005. *See:* Reproduced Record at 1a.

3. Bernadette Biggers, Earl Maraeble, Raquel Smith, Israel Colon, William Davis and Johnnie Roach were the similarly situated individuals whom were adduced during discovery.

4. Richter, the President and sole shareholder of Girard Finance, was subsequently added as a Respondent through a motion to amend.

5. 43 P.S. §§ 955(h)(4) and 955(h)(8)(1).

proposed order from which this appeal was filed.[6]

Girard Finance and Richter first argue that the PHRC erred as a matter of law when it asserted its legal authority and jurisdiction over commercial loans made to corporate tavern owners. We disagree.

Section 7 of the PHRA, 43 P.S. § 957, lists the powers and duties of the PHRC. Section 7(f) of the PHRA, expressly authorizes the PHRC "[t]o initiate, receive, investigate and pass upon complaints charging unlawful discriminatory practices." 43 P.S. § 957(f). Section 5(h)(8) of the PHRA makes it unlawful to "[d]iscriminate in real estate-related transactions." 43 P.S. § 955(h)(8). "[R]eal estate-related transactions" include "the making or purchasing of loans ... for ... commercial property." Section 4(y)(1) of the PHRA, 43 P.S. § 954(y)(1).

■ Moreover, this Court has specifically held that "under the [PHRA], the [PHRC] has both the jurisdiction and the authority to investigate, prosecute and remedy unlawful housing discrimination practices in the Commonwealth, including claims of reverse redlining." *McGlawn v. Pa. Human Relations Comm'n*, 891 A.2d 757, 766 (Pa.Cmwlth.2006). The instant case concerns real estate-related discrimination involving reverse redlining.[7] Accordingly, the PHRC did not err when it asserted its legal authority and jurisdiction

over commercial loans made to corporate tavern owners.

Girard Finance and Richter next argue that Harris and the other similarly situated Claimants did not have standing to bring this claim under the PHRA. Specifically, Girard Finance and Richter contend that Claimants Harris, Maraeble, Davis, Colon, Smith, Biggers, and Roach are individuals and did not enter into any of the loan agreements that were at issue before the PHRC, thus, they do not have a substantial, direct, and immediate interest in this matter. They assert that Skintight Lounge, Inc. (Skintight)[8] is the only Claimant with standing as Skintight actually entered into a loan agreement with Girard Finance. We disagree.

■ "Standing is a core jurisprudential requirement that looks to the party bringing the legal challenge and asks whether that party has actually been aggrieved as a prerequisite before the court will consider the merits of the legal challenge itself." *R.H.S. v. Allegheny County Dep't of Human Servs., Office of Mental Health*, 936 A.2d 1218, 1229 (Pa.Cmwlth.2007) (quoting *Commonwealth ex rel. Judicial Conduct Bd. v. Griffin*, 591 Pa. 351, 360, 918 A.2d 87, 93 (2007)).

■ The evidence establishes, and PHE Ayres found, that the loans were made to the corporations and the individuals. Cer-

---

6. "Our scope of review from a determination of the [PHRC] is whether it is in accordance with the law, whether constitutional rights have been violated and whether the findings are supported by substantial evidence." *Garner v. Pa. Human Relations Comm'n*, 16 A.3d 1189, 1198 n. 3 (Pa.Cmwlth.2011).

7. Redlining is 'the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents.' Redlining violates the FHA. 'Reverse redlining is the practice of extending credit on unfair terms to those

same communities.' Reverse redlining has been held to violate civil rights laws, including the FHA [Fair Housing Act, 42 U.S.C. §§ 3601–3619] and [S]ection 1982 [of the Civil Rights Act, 42 U.S.C. § 1982].
*Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 20 (D.D.C.2000) (citations omitted).

8. Skintight is the bar owned by Claimant Harris. On or about June 1, 2006, Harris filed an amended complaint to add Skintight as a named Complainant.

tified Record (C.R.), Vol. 1, tab 1 at 60. In addition, Richter testified that personal guarantees were standard documents in his loan transactions. Notes of Testimony (N.T.), June 4, 2008 at 148. As the subject matter of the complaint is the loans, and the individuals were personally liable for said loans, the individuals had standing to bring the claims. Accordingly, Claimants Harris, Maraeble, Davis, Colon, Smith, Biggers, and Roach had standing to bring their claims under the PHRA.

Girard Finance and Richter next contend that certain claims were barred by the statute of limitations. Specifically, Girard Finance and Richter contend that under the PHRA claimants have 180 days from the date of discrimination to bring a claim. Section 9(h) of the PHRA, 43 P.S. § 959(h). They assert that Maraeble's bar was sold on February 3, 2004, thus, the filing of Harris' complaint on January 10, 2005, is well past the statute of limitations. Similarly, they assert that Davis' last loan advance occurred on April 8, 2004, making her claim beyond the 180 days, and lastly, Biggers' bar was sold on December 2, 2004, ending her dealings with Girard Finance and Richter, and making her claim beyond the 180 days.

The PHRC argues that similarly situated persons are not required to individually comply with the PHRA's statute of limitations requirement. It asserts that the PHRC's regulations explicitly provide that: "the date of the occurrence of the practice will be deemed to be any date subsequent to the occurrence of the practice up to and including the date upon which the unlawful discriminatory practice shall have ceased." 16 Pa.Code § 42.14(a). The PHRC further argues that because Girard Finance and Richter had a practice and/or policy of predatory lending, it is a serial and/or systematic violation, thus, under *Jensen v.*

*Frank,* 912 F.2d 517 (1st Cir.1990), the similarly situated Claimants can be deemed to have timely filed their complaints. We agree with the PHRC.

■ Section 9(h) of the PHRA provides that "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination...." 43 P.S. § 959(h). However, "[a] plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts that fall outside the ... limitations period." *Barra v. Rose Tree Media Sch. Dist.,* 858 A.2d 206, 213 (Pa.Cmwlth.2004).

The United States Supreme Court addressed the continuing violation doctrine in *Havens Realty Corporation v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). The *Havens* Court held that where a plaintiff challenges not just one incident of conduct violative of the Fair Housing Act (FHA),[9] but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice. *Id.* In *Havens,* the petitioners argued that respondents'

> claims [were] time-barred under § 812(a) of the Fair Housing Act, 42 U.S.C. § 3612(a). That section requires that a civil suit be brought within 180 days after the alleged occurrence of a discriminatory housing practice. As petitioners note, although five different specific incidents allegedly in violation of the Fair Housing Act are detailed in the complaint, **the four involving Coleman occurred more than 180 days before the complaint was filed, and the fifth, which was within 180 days of filing, involved only Coles,** whose claims are already the subject of a consent order

9. 42 U.S.C. §§ 3601–3619.

entered by the District Court. **The Court of Appeals, adopting a 'continuing violation' theory, held that because the Coles incident fell within the limitations period, none of the claims [were] barred.** *Id.*, 455 U.S. at 380, 102 S.Ct. 1114 (emphasis added). The United States Supreme Court agreed with the Court of Appeals and explained:

> [A] 'continuing violation' of the Fair Housing Act should be treated differently from one discrete act of discrimination. Statutes of limitations ... are intended to keep stale claims out of the courts. Where the challenged violation is a continuing one, the staleness concern disappears.... [W]e therefore conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

*Id.*, 455 U.S. at 381, 102 S.Ct. 1114 (citations and footnote omitted).

■ In the instant case, Girard Finance and Richter were not charged with isolated acts of reverse redlining, but rather, the unlawful practice of predatory lending. Thus, because Harris' complaint was filed within 180 days of the last asserted occurrence of the practice, Maraeble, Davis, and Bigger's claims are timely. Accordingly, Maraeble, Davis and Bigger's claims are not barred by the statute of limitations.

Next, Girard Finance and Richter argue that the PHRC did not prove that the loans at issue were predatory and/or the PHRC did not prove racial discrimination in Girard Finance's lending practices. Specifically, Girard Finance and Richter contend that there was no evidence presented to show that Girard Finance targeted minorities through advertising or direct marketing efforts. Rather, the only evidence of discriminatory practices was the Claimants' races and their descriptions of the Claimants' neighborhoods. Girard Finance and Richter assert the mere fact that Girard Finance's customers are corporations owned by minorities simply reflects the composition of the relevant market and does not prove unlawful discrimination.

The PHRC, on the other hand, maintains that there was overwhelming evidence that numerous unfair and predatory terms and conditions were built into each of Girard Finance and Richter's loans and that their predatory lending practices were discriminatory. Specifically, PHE Ayres found that Girard Finance and Richter charged a standard 20% add-on interest rate on virtually all of their loans, and used a repayment formula that resulted in a total loan payback amount of double the principal. Finding of Fact (FOF) No. 7, C.R., Vol. 1, tab 1 at 2. State and Federal law recognize that excessive interest rates may be characteristic of a predatory loan. *See McGlawn; Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7 (D.D.C. 2000). In addition, PHE Ayres found that Girard Finance and Richter used the Rule of 78 as their amortization method. FOF No. 15, C.R., Vol.1, tab 1 at 3. The PHRC asserts that the Rule of 78 is predatory by definition because it acts as a prepayment penalty if the loan is paid off early. In the instant case, the Rule of 78 application effectively made Girard Finance's interest rate 34 percent.

In addition, the PHRC argues that Girard Finance and Richter charged unjustified points on their loans which is also a sign of a predatory loan, and engaged in the predatory practice of flipping loans. A borrower usually pays points to reduce his interest rate, but Girard Finance charged points without reducing interest rates.

Loan flipping is the act of repeatedly refinancing a mortgage loan with no benefit to the borrower. Girard Finance effectively obtained additional money while steadily eroding Claimants' equity in their properties. Further, Girard Finance and Richter used balloon payments in their loans, as well as explicit pre-payment penalties. Moreover, they created a conflict of interest for themselves by requiring borrowers to put Richter, his former wife or another Girard Finance employee on their Board of Directors. Finally, Girard Finance and Richter were extending loans that exceeded the borrowers' needs and repayment capacity. This Court, in *McGlawn*, held that "one of the clearest indicators of a predatory and unfair loan is one which exceeds the borrower's needs and repayment capacity." *Id.*, 891 A.2d at 774.

■■ Lastly, the PHRC asserts that it did not have to prove that Girard Finance and Richter targeted minorities, only that there is a disparate impact based on race. The PHRC asserts that statistical evidence showing that lenders made their loans to predominantly minority borrowers and in dominantly minority neighborhoods is sufficient to establish a prima facie showing of disparate impact. The evidence established that out of 44 loans extended by Girard Finance, 42 were made to minorities. The PHRC contends that such evidence, combined with the fact that the neighborhoods were overwhelmingly minority, represents substantial evidence to support a finding that Girard Finance and Richter's lending activities had a disparate impact on African Americans and other minorities.

The seminal case prohibiting reverse redlining is [*Hargraves* ]. There, the United States District Court adopted a two-pronged test for discrimination under the FHA based on reverse redlining. First, the plaintiffs must establish the defendant's lending practices and loan terms were predatory and unfair. *Hargraves*. Second, the plaintiffs must establish that defendant intentionally targeted them because of their race or that the defendant's lending practices had a disparate impact on the basis of race. *McGlawn*, 891 A.2d at 765. "Whether lending practices are predatory and unfair is a question for the fact finder. *Hargraves*." *Id.*, 891 A.2d at 769. Here, PHE Ayres deemed the PHRC's expert, Steven I. Butler (Butler), qualified as an expert in commercial lending. N.T., April 23, 2008 at 374. Butler testified that a predatory loan is one that is given with no thought or analysis as to the borrower's ability to repay. He further testified, at length, to what he considers "red flags of predatory lending," i.e., "high interest rates, high upfront fees, high late fees, hidden fees, hidden costs, [and] a lack of disclosure to the borrower." N.T., April 24, 2008 at 18. Butler opined that the loan Girard Finance issued to Harris "ha[d] all the markings of a predatory loan." N.T., April 24, 2008 at 30. Moreover, the testimony of the similarly situated Claimants, the exhibits accepted into evidence, i.e., the loan documentation, and the testimony of Richter, all indicate that all of Girard Finance and Richter's loans contained high interest rates, some included balloon payments, while others consisted of numerous reset loans (loan flipping), and most, if not all, were made with no analysis to the borrower's ability to repay. Clearly, there was substantial evidence to conclude that Girard Finance and Richter's lending practices and loan terms were predatory and unfair.

The issue thus becomes whether Girard Finance and Richter intentionally targeted Claimants because of their race or whether their lending practices had a disparate impact on the basis of race. The United States Supreme Court in *Connecticut v.*

*Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) held that it is not necessary to prove that a specific practice had a "racial purpose or invidious intent," a practice can be "invalid because [it] had a disparate impact." *Id.,* 457 U.S. at 446, 102 S.Ct. 2525 (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

Here, Joseph A. Shannon (Shannon), the PHRC's investigator, testified that out of the 32 larger loans Girard Finance extended to tavern owners, the racial breakdown of the applicants was: 1 Jamaican, 4 Hispanic, 2 white, 1 multi-racial, and 24 African Americans. N.T., May 1, 2008 at 248. He further testified that the breakdown of the tavern locations was as follows: out of the individual geographical locations, 79 percent were African American neighborhoods, and 87 percent were minority neighborhoods. *Id.,* at 249–252. Shannon concluded, the two analyses revealed there was a disparate impact. *Id.,* at 268. Based on this evidence, the PHRC concluded there was substantial evidence that Girard Finance and Richter's lending practices had a disparate impact on the basis of race.[10] " 'Once a prima facie case is established, a rebuttable presumption of discrimination arises.' ... 'The burden then shifts to the defendant to show some legitimate, nondiscriminatory reason for its action.' " *McGlawn,* 891 A.2d at 773 (quoting *City of Pittsburgh Comm'n on Human Relations v. DeFelice,* 782 A.2d 586, 591 (Pa.Cmwlth.2001)).

This shifting in the burden of proof was clarified by this Court in *Johnstown Redevelopment Authority v. Pennsylvania Human Relations Commission,* 124 Pa. Cmwlth. 344, 556 A.2d 479 (1989). The *Johnstown* Court, quoting the Pennsylvania Supreme Court, explained:

---

**10.** Statistics are sufficient to prove a prima facie case of disparate impact. *Int'l Broth. of*

---

Nothing about the [PHRA] removes its operation from the bedrock concept of our jurisprudence that one who alleges wrong doing must supply the proof. The stated analysis is no more than an aid to evaluating the proof. If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. Absent a response, the 'presumption' of discrimination arising from the plaintiff's *prima facie* case stands determinative of the factual issue of the case. In other words, if the [respondent] rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a *prima facie* case. If, however, the [respondent] offers a non-discriminatory explanation for the dismissal, the presumption drops from the case. As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard: Has the plaintiff proven discrimination by a preponderance of the evidence? Stated otherwise, **once the [respondent] offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then 'decide which party's explanation of the [respondent's] motivation it believes[.]'** The plaintiff is, of course, free to present evidence and argument that the explanation offered by the [respondent] is not worthy of belief or is otherwise inadequate to persuade the tribunal that [his/her] evidence does preponderate to prove discrimination. [He/she] is not,

---

*Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

however, entitled to be aided by a presumption of discrimination against which the [respondent's] proof must 'measure up.'

*Id.,* 556 A.2d at 483 (emphasis added) (quoting *Allegheny Housing Rehabilitation Corp. v. Pa. Human Relations Comm'n,* 516 Pa. 124, 131, 532 A.2d 315, 319 (1987)).

In the instant case, the only non-discriminatory explanation offered by Girard Finance and Richter was given by Paul Herron (Herron). The parties stipulated that Herron was qualified as an expert in tavern bar financing and as a tavern attorney. N.T., July 16, 2008 at 154. When asked why Girard Finance's business comes predominantly from the Philadelphia area, as opposed to the outlying counties, Herron testified:

I **guess** for a few reasons. One of them I **think,** is that there's not the same kind of turnover in the bars in the outlying counties. You see, people who own those bars seem to hold on to them for a long time. They stay within families, whereas the corner bars in the city of Philadelphia have always turned over fairly frequently. That's one reason. Plus, you're talking about places with lower purchase prices in the city.

*Id.,* at 185 (emphasis added). Herron further testified that the marketplace for Girard Finance is "[n]inety percent minority and **maybe** 10% non-minority." *Id.,* at 186 (emphasis added). He explained that "[t]he typical customer of these taproom finance companies was **usually** the minority individual who wanted to operate a corner tavern." *Id.,* at 186 (emphasis added). Clearly, there is nothing definitive about this explanation.

Assuming arguendo that the trier of fact could rationally conclude that the above evidence rebutted the PHRC's prima facie showing that the lending practices were not discriminatorily motivated, the trier of fact must then decide which party's explanation of Girard Finance and Richter's motivation it believes. *Allegheny Housing.* Here, although PHE Ayres did not comment on Herron's testimony, he clearly believed Claimants' explanation over that offered by Girard Finance and Richter. We see no reason to disturb that determination.

The record is replete with evidence that Girard Finance and Richter preyed on minorities to make a profit. In addition to the statistical analysis offered to prove disparate impact, the testimony of Richter's own witnesses, and Claimants' testimony show Girard Finance and Richter made a living buying and reselling the same bars over and over in the minority community. For example, when Harris purchased his bar, Richter was the lender-in-possession. N.T., July 19, 2008 at 19. In addition, the previous owners of Harris' bar were Richter's clients, i.e., he financed their purchase of the bar, and Richter obtained a purchaser when Harris decided to sell his bar. N.T., July 14, 2008 at 147, 165–166. Further, Richter provided the financing to the previous owner of Smith's bar. N.T., July 14, 2008 at 180. Moreover, Richter was the lender-in possession when Smith purchased her bar. N.T., July 18, 2008 at 180. Smith eventually had to sell her bar but has not received any money from that sale. N.T., July 14, 2008 at 183–186. Similarly, although Davis owned his bar when Richter became involved, subsequent to Richter lending Davis money, Davis was forced to sell his bar. Davis received no money from the sale of his bar. N.T., July 14, 2008 at 186–197. In addition, Biggers was referred to Richter by Maraeble. N.T., June 4, 2008 at 11. Biggers financed her purchase of the bar through Girard Finance, and subsequently took out 3 additional loans. *Id.,*

at 12, 25. Eventually she was so far behind Richter told her she needed to sell her bar and obtained another African American buyer. *Id.,* at 27, 28. Biggers was not aware of the sale until she was told to get out. *Id.,* at 29. Finally, Roach owned two bars prior to working with Richter. N.T., July 16, 2008 at 223. Subsequent to Richter lending him money, Roach had to sell one bar for which he received no money, and Girard Finance foreclosed upon the second bar. N.T., July 16, 2008 at 231–232.

In addition to all of the Claimants being minorities and owning bars in minority neighborhoods, Girard Finance and Richter's own witnesses, i.e., Ken McCoy, Barror Edegife, Arthur Thomas, Kim Graves, Maryann Byrd, Marvin Kilgore, Keary Willis, and Chapel McDonald, all testified they were African American and/or black who owned corner taverns financed by Girard Finance. N.T., July 15, 2008 at 54, 68, 92, 128, 176, 191, 209, 223. Accordingly, the PHRC proved that the loans at issue were predatory and that Girard Finance and Richter's lending practices were racially motivated.

Lastly, Girard Finance and Richter argue that the PHRC erred as a matter of law in awarding damages for which there is no record evidence, let alone substantial evidence. Specifically, Girard Finance and Richter contend that Claimants received damages in four categories: interest rates, loss of their bars, loss of personal property in their bars, and embarrassment and humiliation. Concerning interest rate damages, Girard Finance and Richter assert that Claimants could not testify to what interest rate they could have or should have received, therefore damages cannot be calculated pertaining to overpayment of interest. With respect to loss of their bars, Girard Finance and Richter assert Claimants testified that they did not lose

their bars because of Girard Finance or Richter's actions. Similarly, regarding loss of personal property in their bars, Girard Finance and Richter assert that those losses had nothing to do with Girard Finance and Richter. Rather, the new bar owners would not let Claimants reclaim their personal property. Concerning damages for embarrassment and humiliation, Girard Finance and Richter assert that there was no evidence Claimants were embarrassed or humiliated because of their loans, most testified that they were embarrassed they lost their bars but that was independent of any actions of Girard Finance and Richter. We disagree.

 Section 9(f)(1) of the PHRA provides in pertinent part:

[I]n those cases alleging a violation of section 5(d), (e) or (h) ... where the underlying complaint is a violation of section 5(h) ... **the [PHRC] may award actual damages, including damages caused by humiliation and embarrassment, as, in the judgment of the [PHRC], will effectuate the purposes of this act,** and including a requirement for report of the manner of compliance.

(Emphasis added). An award for humiliation and embarrassment authorized by Section 9(f)(1) of the Act "is extremely fact-specific[,]" and "evidence regarding both the nature of the discriminatory conduct and the victim's reaction thereto is key." *New Corey Creek Apartments, Inc. v. Pa. Human Relations Comm'n,* 865 A.2d 277, 282–283 (Pa.Cmwlth.2004). "[A] plaintiff's own testimony of embarrassment and humiliation can be sufficient to support an award for compensatory damages." *Bogle v. McClure,* 332 F.3d 1347, 1359 (11th Cir.2003). Further,

'the legislature has given the [PHRC] broad remedial powers to cope with the problem of discrimination.' '[T]he ex-

pertise of the Commission in fashioning remedies is not to be lightly disregarded.' '[W]e may only upset the Commission's award if we find it is an attempt to achieve ends other than the stated purpose of the Act.'

*McGlawn*, 891 A.2d at 774 (quoting *Consolidated Rail Corp. v. Pa. Human Relations Comm'n*, 136 Pa.Cmwlth. 147, 582 A.2d 702, 708 (1990)). "An award under the [PHRA] serves not only to restore the injured party to pre-injury status, but also to **discourage future discrimination.**" *McGlawn*, 891 A.2d at 775 (emphasis added). We will address each Claimant's award separately.

■ Harris was awarded $21,716.73 in actual damages, and $15,000.00 in damages for embarrassment and humiliation. According to PHE Ayres' opinion, and the record evidence, Harris' original loan amount totaled $45,000.00, the 20% add-on interest totaled $47,250.00, and the payback amount totaled $95,500.00.[11] PHRC's Op. at 62; PHRC's Ex. 3. Had Harris paid 20% interest as opposed to 20% add-on interest, his interest would have totaled $20,533.27. PHE Ayres, thus, deducted the actual interest amount from the predatory add-on interest amount to arrive at a total of $26,716.73. Because Harris received $5,000.00 from the eventual sale of his bar, PHE Ayres subtracted that amount and awarded Harris $21,716.73 in actual damages. Accordingly, there is substantial evidence to support Harris' actual damage award.

■ Concerning Harris' embarrassment and humiliation award, Harris testified as to how his interactions with Girard Finance and Richter affected his life. N.T., April 23, 2008 at 99–104. Harris explained that to go from thinking you are

buying and/or selling a business, to finding out all the paperwork was fraudulent, and you put everything you had into it and ended up with nothing was devastating. *Id.*, at 102. He further testified that on a scale from 1 to 10 he would rate his embarrassment and humiliation an "11." *Id.*, at 104. Clearly, PHE Ayres' award of $15,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

■ Smith was awarded $43,516.99 in actual damages, and $20,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Smith's payback amount totaled $66,690.00, which included $29,640.00 in add-on interest. PHRC's Op. at 63; PHRC's Ex. 16. Had Smith paid 20% interest as opposed to 20% add-on interest, her interest would have totaled $16,123.01. PHE Ayres, thus, deducted the actual interest amount from the predatory add-on interest amount to arrive at a total of $13,516.99. Because Smith testified she put $20,000.00 down when she purchased the bar, and received nothing when she sold it, PHE Ayres added that amount to the $13,516.99 and awarded Smith actual damages in the amount of $33,516.99. *See:* N.T., April 30, 2008 at 244–245; N.T., July 14, 2008 at 183–186. Accordingly, there is substantial evidence to support Smith's actual damage award.

■ Regarding Smith's embarrassment and humiliation award, Smith testified that her interactions with Girard Finance and Richter "impacted [her life] tremendously" because when she left the bar she didn't expect to leave with nothing. N.T., April 30, 2008 at 252. She further explained that this was especially true because at the time she owned the

---

11. This total includes a $1,000.00 fee for "SERVICE CHARGE[,]" and a $1,200.00 fee for "LEGAL AND RECORDING COSTS[.]" PHRC's Ex. 3.

bar she had seven children she cared for on her own, and as a result of her involvement with Girard Finance and Richter, she could no longer afford her rent and had to leave her residence and move in with a friend. *Id.*, at 252. She concluded by testifying that on a scale from 1 to 10 she would rate her embarrassment and humiliation a "10." *Id.*, at 255. Clearly, PHE Ayres' award of $20,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

 Colon was awarded $23,316.99 in actual damages, and $20,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Colon's original loan amount totaled $35,000.00, the 20% add-on interest totaled $29,440.00, and the payback amount totaled $66,240.00. PHRC's Op. at 64; PHRC's Ex. 70; N.T., April 30, 2008 at 32. Had Colon paid 20% interest, rather than 20% add-on interest, his interest would have totaled $16,123.01. PHE Ayres, thus, deducted the actual interest amount from the predatory add-on interest amount to arrive at a total of $13,316.99. Because Colon testified that he was never permitted to retrieve his personal belongings from the bar, i.e., a personal weapon, sports memorabilia autographed by professional athletes, and computers and equipment, totaling over $10,000.00 in value, PHE Ayres added $10,000.00 to that amount for a total actual damages award of $23,316.99. N.T., April 30, 2008 at 43–44. Accordingly, there is substantial evidence to support Colon's actual damages award.

 Concerning Colon's embarrassment and humiliation award, Colon testified as to how his interactions with Girard Finance and Richter affected his life. *Id.*, at 45–47. Colon testified it was a "horrifying experience .... to go from having something you've always [wanted] ... and then being taken from you ... without your control." *Id.*, at 45. When asked to rate his embarrassment and humiliation on a scale of 1 to 10, he responded "[o]ff the scale[,][he] couldn't even put a number on it." *Id.*, at 46. Clearly, PHE Ayres' award of $20,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

 Biggers was awarded $35,979.19 in actual damages, and $20,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Biggers' original loan amount totaled $32,150.00,[12] the 20% add-on interest totaled $25,720.00, and the payback amount totaled $57,870.00. PHRC's Op. at 65; Supplemental Original Record (Supp. O.R.), Tab 17. Had Biggers paid 20% interest as opposed to 20% add-on interest, her interest would have totaled $15,800.55.[13] Biggers' loan was reset two times thereafter. The second reset loan amount totaled $47,639.00, the 20% add-on interest totaled $48,005.00, and the payback amount totaled $95,644.00. PHRC's Op. at 65; Supp. O.R., Tab 18. Had Biggers paid 20% interest as opposed to 20% add-on interest, her interest would have totaled $21,945.26.[14] Thus, PHE Ayres deducted the actual interest amounts from the predatory add-on interest amounts to arrive at an actual damage award of $35,979.19. Accordingly, there is substan-

12. PHE Ayres inadvertently stated in his opinion that the original loan totaled $34,300.00, however, it did not affect his calculations as the rest of his figures are correct.

13. The difference between the two interest amounts totals $9,919.45.

14. The difference between the two interest amounts totals $26,059.74.

tial evidence to support Biggers' actual damage award.

■ Regarding Biggers' embarrassment and humiliation award, Biggers testified as to how her interactions with Girard Finance and Richter affected her life. N.T., June 4, 2008 at 33–36. Biggers testified Richter would tell her one thing, and then another; and he would laugh and grin like they were buddies when they were not. *Id.,* at 34. Biggers opined that because of this experience she feels betrayed and can no longer trust anyone. *Id.,* at 35. She further testified that it was embarrassing when she sent others to drop off her loan payments, and he would tell them to talk Biggers into selling the bar because she was behind on her loan payments. *Id.,* at 46, 80. She further testified that on a scale from 1 to 10 she would rate her embarrassment and humiliation a "10." *Id.,* at 36. Clearly, PHE Ayres' award of $20,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

■ Davis was awarded $124,040.47 in actual damages, and $15,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Davis owned his bar free and clear of any mortgages. PHRC's Op. at 66; N.T., April 25, 2008 at 8. Davis went to Richter for 2 loans. The first loan amount totaled $20,000.00. PHRC's Ex. 25. The second loan amount totaled $14,000.00 of which only $11,546.00 was disbursed on behalf of Davis. PHRC's Ex. 27. Thus, Davis received a total of $31,546.00 from Girard Finance. Davis' payments on both loans totaled $6,687.00. PHRC's Ex. 26 at 2-4; Ex. 30 at 2-5. Girard Finance and Richter subsequently sold Davis' bar for

$150,000.00 [15] of which Davis received only $1,100.53. PHRC's Ex. 31. Thus, PHE Ayres deducted the net amount Davis received from Girard Finance in loans, and the amount he received from the sale of his bar, from the actual sale price of his bar to arrive at a total damage award of $124,040.47. Accordingly, there is substantial evidence to support Davis's actual damage award.

■ Concerning Davis' embarrassment and humiliation award, Davis testified as to how his interactions with Girard Finance and Richter affected his life. N.T., April 25, 2008 at 47–53. Davis testified that it was "drastic" having a guy come into his bar and tell him to get out because he bought the bar. *Id.,* at 51. In addition, the police came and threw Davis out. *Id.,* at 52. Further, when Davis went back to get his personal belongings, he was told they were all thrown in the trash. *Id.,* at 52. When asked to rate his embarrassment and humiliation on a scale from 1 to 10, Davis responded "11." *Id.,* at 52–53. Clearly, PHE Ayres' award of $15,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

■ Maraeble's estate was awarded $130,404.53 in actual damages, and $15,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Maraeble owned his bar prior to any involvement with Girard Finance and Richter. PHRC's Op. at 67; N.T., April 24, 2008 at 299. Maraeble took out a loan from Girard Finance to expand his bar which he subsequently refinanced. PHRC's Ex. 33. That mortgage was eventually paid off, and Maraeble owned his bar free and clear of any debt.

---

15. PHE Ayres stated in his opinion that the bar was sold for $160,000.00; however, that figure was clearly a typo as his totals were correct, i.e., $150,000.00 less $25,959.53 totals $124,040.47.

PHRC Ex. 36; N.T., April 24, 2008 at 307–308. Subsequently, Maraeble borrowed money 6 more times from Girard Finance; each loan rolling into the latter. The total amount Maraeble received from Girard Finance and Richter was approximately $52,805.00. PHRC's Ex. 38, 39, 40, 42; Supp. O.R. Ex. 2, 4. Maraeble's loan payments, however, totaled approximately $114,036.00. PHRC's Ex. 38, 39, 40, 42; Supp. O.R., Tab 2, 4. Maraeble subsequently sold the bar. Although the sale price was $90,000.00, Maraeble received only $15,826.00. N.T., April 24, 2008 at 342; Supp. O.R., Tab 8. Thus, PHE Ayres added the difference between what he received and what he paid in loans ($61,231.00) to the sale price ($85,000.00),[16] and deducted the amount he received from the sale ($15,826.47) to arrive at an actual damage award of $130,404.53. Accordingly, there is substantial evidence to support Maraeble's actual damage award.

■ Regarding Maraeble's embarrassment and humiliation award, Grace Maraeble testified as to how her husband's interactions with Girard Finance and Richter affected his life. N.T., April 24, 2008 at 345–347. Mrs. Maraeble testified that it was embarrassing going from owning your own bar, to locking the doors and sneaking out the side door with your bags in your hand. *Id.*, at 345. Moreover, it was embarrassing filing for personal bankruptcy on account of putting everything they earned into the bar. *Id.*, at 346. When asked to rate their level of embarrassment and humiliation on a scale of 1 to 10, Mrs. Maraeble responded "10." *Id.*, at 347. Clearly, PHE Ayres' award of $15,000.00 for embarrassment and humiliation is not

an attempt to achieve ends other than the PHRA's stated purpose.

■ Roach was awarded $173,976.00 in actual damages, and $15,000.00 in embarrassment and humiliation damages. According to PHE Ayres and the record evidence, Roach owned two bars free and clear of any mortgages, 1260 Hotel and Restaurant (1260), and 53 Basin Street (Basin Street). PHRC's Op. at 68; N.T., May 1, 2008 at 34–35. Girard Finance and Richter extended Roach 2 loans in the amount of $25,000.00; one for each bar. PHRC's Ex. 49, 50. Roach thereafter borrowed another $5,000.00 for each bar. PHRC's Ex. 55, 57. Roach subsequently rolled the two loans into a third loan for each bar, said loans each totaling $38,100.00, $31,694.00 of which paid off the first 2 loans with respect to 1260, and $31,467.00 of which paid off the first 2 loans with respect to Basin Street. PHRC's Ex. 59, 60; Supp. O.R., Tab 9 at 10, 10 at 5.

With respect to 1260, Roach received approximately $36,406.00 from Girard Finance, and made payments on the loans totaling approximately $20,383.00. PHRC's Ex. 60; Supp. O.R., Tab 9, 10. Thus, his net amount received from Girard Finance totaled $16,024.00. Upon the advice of Richter, Roach sold 1260. Roach testified that 1260 sold "for $150,000.00 or more[']" but Roach walked away with nothing. N.T., May 1, 2008 at 63. Hence, PHE Ayres deducted $16,024.00 from $150,000.00 to arrive at an actual damage award for 1260 totaling $133,976.00. Accordingly, there is substantial evidence to support this portion of Roach's actual damage award.

---

16. PHE Ayres inadvertently used the amount of $85,000.00 instead of $90.000.00; however, because these figures were used to arrive at a compensatory damage award not based on actual out of pocket expenses, and some of the above numbers are approximate based on available information, we hold the award is still based on substantial evidence notwithstanding this discrepancy.

With respect to Basin Street, unbeknownst to Roach, Girard Finance and Richter filed a deed transferring title of Basin Street to Girard Holdings, LLC. N.T., May 1, 2008 at 75–76; PHRC's Ex. 63. According to the deed and the settlement statement, Girard Finance paid $40,000.00 for Basin Street. PHRC's Ex. 63, 64. Because Roach never received any money for this transfer, PHE Ayres awarded the sum of $40,000.00 to Roach for the actual damages related to Basin Street. Accordingly, there is substantial evidence to support this portion of Roach's actual damage award.

■ Concerning Roach's embarrassment and humiliation award, Roach testified as to how his interactions with Girard Finance and Richter affected his life. N.T., May 1, 2008 at 79–83. Roach testified that when you work half your life for something and come out with nothing, it is more than stressful. *Id.,* at 80. He further testified he was embarrassed because all his friends were "bar people" and he can no longer associate with them. *Id.,* at 82–83. He was actually thrown out of Basin Street more than once and had to call the police to get back in before finally finding out that Richter changed the deed and had him legally evicted. *Id.,* at 68–76. When asked what he would rate his embarrassment and humiliation on a scale from 1 to 10, Roach responded "15." *Id.,* at 83. Clearly, PHE Ayres' award of $15,000.00 for embarrassment and humiliation is not an attempt to achieve ends other than the PHRA's stated purpose.

We reiterate that one of the purposes of a damage award is "to discourage future discrimination." *McGlawn,* 891 A.2d at 775. Given the amount of money Girard Finance and Richter acquired as a result of their predatory lending practices, and how much Claimants lost in the process, i.e., their livelihoods, their bars, their possessions, and their dignity, PHE Ayres appropriately awarded damages based on the record evidence. Girard Finance and Richter's assertion that Claimants did not suffer any embarrassment or humiliation as a result of their actions is without merit. Accordingly, the PHRC did not err in awarding damages.

For all of the above reasons, the PHRC's Final order is affirmed.

Senior Judge FRIEDMAN concurs in the result only.

### ORDER

AND NOW, this 27th day of July, 2012, the Pennsylvania Human Relations Commission's October 24, 2011 Final Order is affirmed.