# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kennedy House, Inc.,  :
                 Appellant  :
                             :
        v.  :   No. 1263 C.D. 2015
                             :   Argued:  May 12, 2016
Philadelphia Commission on  :
Human Relations  :


**BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE DAN PELLEGRINI, Senior Judge**


**OPINION BY
JUDGE COHN JUBELIRER**        **FILED:  July 11, 2016**


Kennedy House, Inc. (Kennedy House) appeals from a June 12, 2015 Order of the Court of Common Pleas of Philadelphia County (common pleas) denying its statutory appeal from a decision of the Philadelphia Commission on Human Relations (Commission).  The Commission concluded that Kennedy House violated Section 9-1108 of the Philadelphia Fair Practice Ordinance (Ordinance) when it denied Jan Rubin's request for a housing accommodation in the form of a waiver of its no-dog policy.  On appeal to this Court, Kennedy House argues that common pleas erred by finding a sufficient nexus between Ms. Rubin's disability and the support provided by her dog, and that the Commission's findings were not based on substantial evidence.  For the reasons that follow, we reverse.

# I. BACKGROUND

Ms. Rubin is 61 years of age and suffers from: "(1) degenerative disc disease at multiple levels of her spine; (2) spinal stenosis at multiple levels of her spine; (3) fibromyalgia; (4) chronic pain; and (5) central nervous system sleep apnea." (Commission Decision, Findings of Fact (FOF) ¶ 13.) Ms. Rubin's conditions affect her mobility and "limit her ability to stand to about [10] to [15] minutes, and her ability to sit to a maximum of [20] to [30] minutes before the pain becomes significant." (FOF ¶ 14.) Ms. Rubin finds it difficult to cook for herself or climb stairs. (Id.) Her conditions have "significantly worsened over the past two years," and she "can no longer work." (FOF ¶¶ 15-16.) Her conditions and the pain from which she suffers "often make[s] it difficult for her to order her day, to get out of bed, to remember to take her medications, and [to] do other simple tasks such as to take a shower, comb her hair[,] and get dressed." (FOF ¶ 21.) To assist her in everyday life, Ms. Rubin employs two part-time caregivers and is assisted by her 10- or 11- year-old Plott Hound named Mira. (FOF ¶¶ 12, 18, 22.) "Mira does not have special training and is a stay-at-home animal that does not accompany Ms. Rubin to places of public accommodation." (FOF ¶ 24.)

Kennedy House "is a residential cooperative building" consisting of approximately 559 apartments in Philadelphia. (FOF ¶¶ 28-29.) Kennedy House has a no-dog policy, but allows other small pets such as cats, caged birds, and fish. (FOF ¶ 30.) Ms. Rubin submitted an application to join the cooperative at Kennedy House and to purchase a unit on February 1, 2011. (FOF ¶ 31.) Ms. Rubin indicated on her application that she requires a "service dog." (FOF ¶ 32; Application, R.R. at 162.) Upon receipt of Ms. Rubin's application, a representative of Kennedy House asked Ms. Rubin "to have a licensed professional

2

write a letter attesting to [her] need for an accommodation." (FOF ¶ 33.) Ms. Rubin submitted a March 10, 2011 letter written by Craig Wynne, M.D., her primary care physician, that stated: "[Ms.] Rubin has multiple medical issues that affect her mobility. She benefits from the support of a service dog. She currently has a dog that serves this role for her. Please consider allowing [Ms. Rubin] to keep the dog. Loss of this animal would impair her ability to function." (R.R. at 154.) Approximately one month later, Kennedy House sought additional information on the requested accommodation and asked Ms. Rubin to complete and submit a certification form provided to her by Kennedy House. (FOF ¶ 38.) The two-page form sought Dr. Wynne's certification that Ms. Rubin qualifies as an individual with a disability as defined by "federal civil rights laws," and that the requested accommodation "is consistent with her needs associated with her disability." (Certification Form, Rubin Ex. 3.) The form stated in bold letters: "IMPORTANT: Do NOT reveal the specific NATURE OR SEVERITY of the individual's disability." (Id.) Dr. Wynne signed the forms and certified that Ms. Rubin is disabled and that the requested accommodation "is consistent with her needs associated with her disability." (Id.)

A unit became available in October 2012, and Ms. Rubin entered into an agreement to purchase said unit. (FOF ¶ 39.) Subsequently, Kennedy House asked Ms. Rubin to attend a Membership Committee, which is a mandatory part of the application process for all applicants to Kennedy House. (FOF ¶¶ 41-42.) At the meeting, which she attended without Mira, Ms. Rubin was asked whether Mira was specially trained and how Mira assisted her with her disability. (FOF ¶ 41.) Ms. Rubin explained that Mira is not specially trained, but stays at home and

3

assists Ms. Rubin "in ordering her day, and in remembering when to take medications, eat meals and get up and out of bed." (FOF ¶ 43.)

"Shortly after the membership meeting, the Board of Directors of Kennedy House voted to deny Ms. Rubin's application." (FOF ¶ 45.) In a letter dated January 22, 2013, explaining its decision, the Board of Directors stated:

> You requested a reasonable accommodation exception to the [Kennedy House] "no[-]dog policy" to allow you to have your dog at the Kennedy House.
> The Board has reviewed your application and request under applicable [Kennedy House] rules and federal law, and has determined that it does not comply with the applicable requirements. Therefore, the Board has voted to deny your application.

(Denial Letter, Rubin Ex. 5.) The unit Ms. Rubin sought to purchase was subsequently sold to another buyer. (FOF ¶ 50.)

## II.  ADJUDICATION IN THE COMMISSION

Ms. Rubin filed a Complaint with the Commission asserting housing discrimination on the basis of Kennedy House's failure to reasonably accommodate her disability. (Compl. ¶¶ 8-39.) Therein, Ms. Rubin alleged that Mira "is a **companion dog**." (Compl. ¶ 13 (emphasis added).) "When I am not able to leave the house for long periods of time, my companion dog gives me emotional support. . . . My companion dog reminds me to wake up, eat meals, and go to sleep when required." (Compl. ¶ 13.) Ms. Rubin further alleges that her request for accommodation was reasonable because "my companion dog would always be on a leash[,] . . . would avoid elevator cars with other residents[,] . . . would exit through the rear entrance instead of the lobby[, and p]ublic and private areas would be kept clean and odor free." (Compl. ¶ 35.) Ms. Rubin's Complaint

4

sought compensatory and punitive damages, costs, and an order that Kennedy House provide training on discrimination laws. (Compl. ¶¶ 36-39.)

Upon review of the Complaint and Kennedy House's Answer thereto, the Commission found that probable cause existed as to a finding of housing discrimination and a hearing was held on March 21, 2014, where Ms. Rubin; Stephen C. Meister, DVM, Mira's veterinarian; and James Giblin, General Manager of Kennedy House; testified. At the hearing, Ms. Rubin was granted leave to amend the Complaint to include a request for an order requiring Kennedy House to grant Ms. Rubin "the right to purchase a unit equivalent to the one which she" was denied and to accept Mira "as a reasonable accommodation necessitated by her disability." (R.R. at 66-67.)

Ms. Rubin testified to the facts discussed above and as follows.[1] Prior to her disability she worked 60 to 80 hours a week for almost 30 years. Upon the onset of her disability, Ms. Rubin found herself with nothing to do and content to stay in bed all the time. Mira helps her order her life, and reminds her to take medications, eat meals, and when to get up. Ms. Rubin does not walk Mira often. Mira is normally walked twice a day by other people. Yet, the times Ms. Rubin is forced to walk Mira is the only time she gets out of her house other than doctor appointments.

At the Kennedy House mandatory Membership Committee meeting, when Ms. Rubin was asked whether Mira would be on a leash, whether she had her shots and tags, she responded that Mira "had a city license and was always on a leash. And as an accommodation to the building, [Ms. Rubin would] only use the service

---

[1] Ms. Rubin's testimony at the March 21, 2014 hearing of the Commission is found at pages 78-125 of the Reproduced Record.

5

elevator and . . . only access the building through the rear, so that any dirt that [Mira] might drag in would be kept outside or in a service area." (Id. at 102.) Ms. Rubin also agreed to only use elevators with Mira when no other person was on the elevator.

On cross-examination, Ms. Rubin testified that she obtained Mira from a rescue prior to her disability, though she did have some mobility restraints at the time and that Mira has no special training. When asked whether Mira performs any tasks that help with her mobility issues, Ms. Rubin responded: "[n]o, that is not why she is here." (Id. at 112.) According to Ms. Rubin, "[Mira] has a timing thing that goes off in her and she reminds me what I am supposed to be doing." (Id.) With regard to the nature of her disability, Ms. Rubin stated that "[t]he physical nature of what is wrong with me very often makes it difficult to [get out of bed and take medications] and [to] remember to do them because the pain is so excruciating." (Id. at 113.) Ms. Rubin further testified that she has not been diagnosed with a mental disability or psychological condition. Upon Kennedy House's request, Ms. Rubin asked Dr. Wynne to write a letter to Kennedy House regarding her disability and the importance of Mira. Ms. Rubin could not recall whether she asked Dr. Wynne to refer to Mira as a service dog. She did not ask Dr. Wynne to testify at the hearing because she assumed that Dr. Wynne could not discuss her physical condition in an open forum.

Dr. Meister testified that he is a licensed veterinarian and has been Mira's veterinarian since 2007 or 2008 and currently sees Mira at Ms. Rubin's house.[2] Dr. Meister testified that, based on his personal observation, Ms. Rubin's disability

_____

[2] Dr. Meister's testimony at the March 21, 2014 hearing of the Commission is found at pages 67-78 of the Reproduced Record.

6

has significantly worsened between 2008 and 2013. Dr. Meister further testified that Mira and Ms. Rubin have a very close relationship where Mira tells Ms. Rubin "what to do in normal situations" and "lets her know when she needs to go out and when she needs to be consoled." (Id. at 72.) On cross-examination, Dr. Meister admitted that he cannot offer a medical opinion as to Ms. Rubin's disability or the sort of treatment that would benefit Ms. Rubin, including whether a dog is necessary to manage her disability. He stated that he was simply providing his "observations of her increasingly worse disability, which I feel fully qualified to discuss." (Id. at 77.)

Mr. Giblin testified on behalf of Kennedy House as follows.[3] Every applicant that wishes to purchase a unit in Kennedy House must first meet with the Kennedy House Membership Committee, which then makes a recommendation to the Kennedy House Board of Directors. It is the Board of Directors that makes the final decision to accept or deny an application. Mr. Giblin first met Ms. Rubin at the Membership Committee meeting where Ms. Rubin told him that Mira was a companion dog that never leaves her home. The Membership Committee recommended that the Board deny the application "because of the inconsistencies" in "the reasonable accommodation requested." (Id. at 135.) According to Mr. Giblin: "We are a no-dog building. There are pets permitted, like cats, caged birds, or fish and there is no other service animal or dog in the building and my recommendation was to deny the application. The Membership Committee did the same, and the Board moved to deny the application." (Id.) On cross-examination, Mr. Giblin stated that it was his understanding that a reasonable accommodation in

_____

[3] Mr. Giblin's testimony at the March 21, 2014 hearing of the Commission is found at pages 129-141 of the Reproduced Record.

7

the form of an assistance animal would only be required under the law when a dog is specially trained to assist a disabled person. Mr. Giblin never asked Ms. Rubin about her disability, but understood from Ms. Rubin's application that she needed a dog to address mobility issues.

Upon review of the evidence, the Commission found all the testimonies credible. (FOF ¶ 52.) The Commission began its reasoning by concluding that the Ordinance is applicable because Kennedy House is a "Housing Accommodation" within the meaning of Section 9-1102 of the Ordinance. (Commission Decision, Conclusions of Law (COL) ¶ 59.)[4] Section 9-1108(1) of the Ordinance provides: "It shall be an unlawful housing and real property practice to deny or interfere with the housing accommodation, commercial property or other real property opportunities of an individual or otherwise discriminate based on his or her . . . disability . . ." Phila. Code § 9-1108(1). The Ordinance defines discrimination as:

> Any direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of actual or perceived . . . disability . . . **or other act or practice made unlawful under this Chapter or under the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania.**

---

[4] A "Housing Accommodation" is defined by the Ordinance as:

> Any building, structure or portion thereof which is used or occupied or is intended, arranged or designed to be used or occupied as the home residence or sleeping place of one or more individuals, groups, or families, and any vacant land offered for sale or lease or held for the purpose of constructing or locating thereon any such building, structure or portion thereof.

Phila. Code § 9-1102(n).

8

Phila. Code § 9-1102(1)(e) (emphasis added).

Finding no precedent directly on point, the Commission viewed the case as one of first impression and interpreted the meaning of Section 9-1108(1) of the Ordinance by looking to Section 804(f) of Title VIII of the federal Civil Rights Act of 1968, commonly referred to as the Fair Housing Act (FHA), 42 U.S.C. § 3604(f).[5] (COL ¶ 62.) Section 804(f) of the FHA makes it unlawful to discriminate in the sale or rental of a dwelling against a person based on a disability.[6] 42 U.S.C. § 3604(f)(1), (2). Discrimination under Section 804(f) of the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

While noting that the Ordinance does not explicitly require a Housing Accommodation to provide a reasonable accommodation for disabled persons, the Commission concluded that because the Ordinance references the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania and the FHA requires reasonable accommodations "when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling," the Ordinance prohibits refusal of reasonable accommodations. (COL

---

[5] The original FHA did not include provisions addressing discrimination based on a disability. However, Section 6(a) of the Fair Housing Amendment Act of 1988 amended Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601-3631, by adding subsection 804(f) prohibiting discrimination based on disability.

[6] Reflecting the times in which it was enacted, the FHA refers to discrimination based on "handicap" rather than "disability." "Disability scholars, however, generally prefer the term 'disability' to handicap, and the Americans with Disabilities Act . . . , 42 U.S.C. §§ 12101–12213 . . . , reflects that preference." Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1285 n.2 (11th Cir. 2014). For this reason, we elect to use "disability" instead of handicap when possible.

¶¶ 60-63, 66-67 (quoting 42 U.S.C. § 3604(f)(3)(B)).)  Upon review of applicable case law and guidance from the U.S. Department of Housing and Urban Development (HUD), the Commission further concluded that "under Section 9-1108(1) of the . . . Ordinance, a reasonable accommodation in the housing context includes not only specially trained 'service animals' but also 'assistance animals.'" (COL ¶ 87.)

The Commission applied the test used by the United States Court of Appeals for the Third Circuit (Third Circuit) to analyze reasonable accommodations challenges under the FHA in <u>Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains</u>, 284 F.3d 442 (3d Cir. 2002).  There, the Third Circuit held that "the [complainant] bears the initial burden of showing that its requested accommodations are '**necessary** to afford [disabled] person[s] [an] equal opportunity to use and enjoy a dwelling' . . . at which point the burden shifts to the defendant to show that the requested accommodations are **unreasonable**."  (COL ¶ 94 (quoting <u>Lapid-Laurel,</u> 284 F.3d at 446) (emphasis added).)  In assessing whether Ms. Rubin met her initial burden, the Commission reasoned:

> (89) Of course, an accommodation is only "necessary" if there is a nexus between the requested accommodation and the individual's disability, as the person with a disability who is requesting the assistance animal must demonstrate a disability-related need for the animal.  That is, the animal [must] work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability.
>
> (90) Kennedy House maintains that there is no nexus between Ms. Rubin's physical mobility disabilities and the emotional support the dog provides.  Kennedy House argues that while Ms. Rubin's dog may contribute to her emotional well-being, she has no psychological

10

or mental health impairments, and the dog purportedly does not assist her with the physical disabilities she does have.

(91) The Commission disagrees with Kennedy House's position regarding the lack of a nexus between Ms. Rubin's disability and the dog's assistance. Ms. Rubin has a physical disability that causes her significant chronic pain, affects her ability to lead a normal and orderly life and take care of herself, and causes social isolation. Her dog substantially aids her, by forcing her to have a more ordered life, by being demanding of her, by reminding her to take her medications, eat meals, get up and out of bed and otherwise reminding Ms. Rubin what she is supposed to be doing at any given time. Although the dog Mira is usually walked by other people, Ms. Rubin also occasionally walks her, allowing Rubin to "sometimes get[] to see [her] neighbors and get a bit of fresh air."

(92) The nexus between Ms. Rubin's disability and the dog's assistance is also supported by her doctor's statement. Ms. Rubin's primary care physician, Dr. Wynn[e] attested that the accommodation requested by Ms. Rubin – allowance of her dog despite Kennedy House's no-dog policy – "is consistent with her needs associated with her disability."

(93) Thus, the record clearly establishes a nexus between the requested accommodation and Ms. Rubin's disability, as the dog Mira, "alleviates one or more identified symptoms or effects of [Ms. Rubin's] disability."

(COL ¶¶ 89-93 (citations and parentheticals omitted).) The Commission therefore concluded that Ms. Rubin "carried her burden and the burden shifted to Kennedy House to show that waiving its 'no-dog' rule for Ms. Rubin would be unreasonable." (COL ¶ 94.) Finding that Kennedy House provided no evidence relevant to the question of whether the accommodation would be unreasonable, the Commission concluded that Kennedy House did not satisfy its burden and further concluded that the requested accommodation "is also reasonable in that it will cost Kennedy House nothing to provide, and no changes or construction to the building

11

would need to be made." (Id.) Accordingly, the Commission held that Kennedy House violated Section 9-1108(1) of the Ordinance and ordered Kennedy House to

> immediately place Ms. Rubin at the top of the waiting list, in the same position in the application process she was in November 2012, before the [u]nit she sought to purchase became available, and shall grant a waiver to its no-dog policy, permitting Ms. Rubin to keep an assistance animal, as a reasonable accommodation to Ms. Rubin's disability.

(COL ¶ 101.) The Commission assessed no compensatory or punitive damages on the basis that the case addressed an issue of first impression and Kennedy House's defense was made in good faith. (COL ¶ 102.)

Kennedy House appealed to common pleas, which adopted the decision of the Commission as its own and held that the Commission's conclusions were based upon substantial evidence of record. This appeal followed.[7]

---

[7] Our scope of review where the trial court did not take its own evidence is:

> limited to a determination of whether there was a violation of constitutional rights, an error of law, or . . . the findings of fact necessary to support the adjudication are supported by substantial evidence. The task of weighing the evidence, both direct and circumstantial, to credit and discredit testimony, to draw inferences and make ultimate findings of fact as to whether a violation of the [Philadelphia] Code occurred is for the Commission. In addition, judicial discretion may not be substituted for administrative discretion, absent bad faith, fraud, capricious action or abuse of power by the Commission.

City of Pittsburgh Comm'n on Human Relations v. DeFelice, 782 A.2d 586, 589 (Pa. Cmwlth. 2001) (citations omitted).

## III.  ISSUES RAISED ON APPEAL

On appeal, Kennedy House argues that common pleas erred by finding a sufficient nexus between Ms. Rubin's physical limitations and the support provided by Mira.  According to Kennedy House, a proposed accommodation is not necessary if it does not provide "'direct amelioration of a disability's effect . . . .'"  (Kennedy House's Br. at 15 (quoting Wisconsin Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 749 (7th Cir. 2006)).)  Kennedy House acknowledges that Ms. Rubin suffers from a disability that limits her mobility; however, it argues that Mira does not provide Ms. Rubin with assistance related to Ms. Rubin's mobility and submits that Ms. Rubin conceded this point in her testimony to the Commission.  According to Kennedy House, common pleas misapplied the law by requiring an accommodation that provides Ms. Rubin with psychological or emotional support when Ms. Rubin has no psychological or emotional disability.  Relatedly, Kennedy House argues that in holding that the Ordinance requires it to provide an accommodation to disabled individuals to keep animals that only have "some relation to their disability," common pleas and the Commission created new law and applied it to Kennedy House retroactively.  (Kennedy House's Br. at 23.)

Kennedy House further argues that the Commission's findings, as adopted by common pleas, are not supported by substantial evidence.  Kennedy House contends that the Commission improperly relied upon the testimony of Dr. Meister, a veterinarian, in determining that sufficient nexus was established between Ms. Rubin's disability and the services provided by Mira.  Dr. Meister unequivocally stated in his testimony that he was not qualified to offer an opinion as to the medical treatments or assistance necessary to alleviate or treat Ms. Rubin's disability.

13

Amici Curiae, four residents of Kennedy House, submitted a brief in support of themselves and other similarly situated residents of Kennedy House. Amici argue that because Ms. Rubin's Complaint was brought under the Ordinance, federal and state precedent addressing the FHA is irrelevant. Amici assert that because the "reasonable accommodation" requirement of the FHA does not apply to the Ordinance, the Commission should not have required Kennedy House to submit evidence that the accommodation requested was unreasonable. Amici further argue, based largely on facts outside the record, that even if the FHA applies, the accommodation ordered by the Commission is unreasonable because allowing a waiver of the no-dog policy will endanger the health and welfare of Kennedy House residents.

## A. Arguments by Amici Curiae

Initially, Ms. Rubin has objected to our consideration of amici's arguments in her brief to this Court. (Ms. Rubin's Amended Br. at 19.) Pursuant to Rule 531(a) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 531(a), "[a]nyone interested in the questions involved in any matter pending in an appellate court, . . . although not a party, may, without applying for leave to do so, file a brief amicus curiae **in regard to those questions**." (Emphasis added.) However, "amicus briefs cannot raise issues not set forth by the parties" and this Court cannot consider evidence that was never made part of the official record. Banfield v. Cortés, 110 A.3d 155, 172 n.14 (Pa. 2015).[8] Much of amici's

---

[8] As discussed above, the Commission concluded that Kennedy House did not meet its burden to produce evidence that the requested accommodation was unreasonable. Amici attempt to meet the burden by submitting facts and arguments. Amici argue that the failure to raise the issues below is excusable because counsel for Kennedy House was appointed by Kennedy

*(Continued…)*

14

arguments rely on facts and raise issues that were not part of the record or set forth by the parties. Thus, we cannot consider amici's arguments. However, this Court is mindful that those who reside in the 559 apartments in Kennedy House have an interest in their safety, security, and quiet possession of their home. (R.R. at 132.) One way the law tries to balance these competing interests is by requiring that an accommodation be reasonable as well as necessary.

## B. Kennedy House's Appeal

The parties have narrowed the issues that are actually before us. Kennedy House does not dispute that Ms. Rubin is disabled within the meaning of the Ordinance, that the relevant provisions of the FHA apply, that refusing to sell the unit to Ms. Rubin due to her disability would violate the Ordinance, and that Kennedy House is required by the Ordinance to offer Ms. Rubin a reasonable

---

House's insurance company and did not involve the residents. Further, amici argue that the failure to put forth proof on the reasonableness of the proposed accommodation is excusable because "[c]ounsel was blind-sided when the Commission re-wrote the [O]rdinance, and engrafted a relatively recent development in disability law – equating 'comfort dogs' with 'service dogs.'" (Amici's Br. at 15.) We disagree with amici that Kennedy House's decision to not offer evidence on the unreasonableness of the accommodation is excusable. Kennedy House was not unaware of the applicability of the FHA, and Kennedy House's proposed conclusions of law filed with the Commission addresses the relevant provisions of the FHA, HUD guidance, and case law addressing the reasonableness requirements of the FHA. (R.R. at 185-88.) To the extent Kennedy House felt "blind-sided" by the Commission's reasoning, it should have raised that issue to common pleas, which it did not. (See Brief of Kennedy House to common pleas at 8, C.R. at Item 10 (stating that it "does not dispute the Commission's reliance on the [FHA] (and HUD's interpretation thereof)").) Although we appreciate that the residents wish Kennedy House had presented evidence of the alleged inadequate number of elevators for the building, the long wait times for elevators, the elderly population of residents in the building, many of whom have disabilities that are incompatible with a large, untrained dog, and other facts they believe support the unreasonableness of the accommodation ordered, Kennedy House did not present this evidence, and we therefore are precluded from considering it in this case.

accommodation prior to denying her application if such accommodation is "necessary to afford [Ms. Rubin] equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The dispute centers on two questions: (1) whether Ms. Rubin established that the requested accommodation was **necessary** to provide her with an equal opportunity to use and enjoy the unit, that is, whether there is a sufficient nexus between her disability and the assistance provided by her dog; and (2) whether the Commission's findings are supported by substantial evidence.

### 1. Whether the accommodation is necessary.

The FHA requires that an accommodation be offered to persons with disabilities if the accommodation "is (1) reasonable and (2) necessary to (3) afford [disabled] persons an equal opportunity to use and enjoy housing." Lapid-Laurel, 284 F.3d at 457 (quoting Bryant Woods Inn, Inc. v. Howard Cty., Md., 124 F.3d 597, 603 (4th Cir. 1997)). Federal courts have interpreted the necessary requirement of the FHA as "meaning that, without the accommodation, the [complainant] will be denied an equal opportunity to obtain the housing of her choice." Wisconsin Cmty. Servs., 465 F.3d at 749; see also Smith & Lee Assoc., Inc. v. City of Taylor, Mich., 102 F.3d 781, 795 (6th Cir. 1996) (holding that complainants "must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice"). In other words, in order to satisfy the necessary element of the FHA, a complainant must demonstrate "a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided . . . ." Bryant Woods Inn, 124 F.3d at 604. "[I]f the proposed accommodation provides **no direct amelioration of a disability's effect**, it cannot be said to be 'necessary.'" Id. (emphasis added).

16

As it relates to whether the use of an animal to assist with a disability is a reasonable accommodation, HUD issued an interpretative rule in October of 2009 that states:

> in the case of assistance/service animals, **an individual with a disability must demonstrate a nexus between his or her disability and the function the service animal provides**. The Department's position has been that animals necessary as a reasonable accommodation do not necessarily need to have specialized training. Some animals perform tasks that require training, and others provide assistance that does not require training.

Pet Ownership for the Elderly and Persons With Disabilities, 73 FR 63834-01 (HUD Interpretive Rule) (emphasis added). HUD further explained the obligations of housing providers in a 2013 notice to its regional and field offices where it stated:

> The reasonable accommodation provisions of [the FHA and HUD's regulations] must be considered in situations where persons with disabilities use (or seek to use) assistance animals in housing where the provider forbids residents from having pets or otherwise imposes restrictions or conditions relating to pets and other animals.

> **An assistance animal is not a pet.** It is an animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability. Assistance animals perform many disability-related functions, including but not limited to, guiding individuals who are blind or have low vision, alerting individuals who are deaf or hard of hearing to sounds, providing protection or rescue assistance, pulling a wheelchair, fetching items, alerting persons to impending seizures, or providing emotional support to persons with disabilities who have a disability-related need for such support. For purposes of reasonable accommodation requests, neither the [FHA] nor [HUD's regulations] requires an assistance animal to be individually trained or certified.

17

> While dogs are the most common type of assistance animal, other animals can also be assistance animals. . . .
>
> Housing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to submit **reliable documentation of a disability and their disability-related need for an assistance animal.**

Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded Programs, HUD Fair Housing and Equal Opportunity Notice 2013-01 (HUD Notice) at 2-3 (emphasis added).

Kennedy House argues that Ms. Rubin has not demonstrated a sufficient nexus between Mira and Ms. Rubin's disability. Kennedy House asserts that the services Mira provides to Ms. Rubin may alleviate a psychological disability, about which there is no medical documentation and Ms. Rubin has stated she does not have, but Mira does not alleviate Ms. Rubin's documented disability related to her mobility. In support of its argument, Kennedy House first cites to Smith v. Powdrill, No. CV 12-06388 DDP RZx, 2013 WL 5786586, at *6 (C.D. Cal. Oct. 28, 2013), involving a claim under the FHA where the complainant sought a waiver of the defendant's no-pet rule as an accommodation for her disability. As in this case, the complainant there asserted that her companion dog helped her keep "a regular routine of caring for [her]self, motivates [her] to get out of bed, clean, maintain relationships with friends and family, and to exercise." Id. at *1. However, the complainant there suffered from various **mental disabilities** that inhibited her "ability to take care of herself, get out of bed, interact with others and remain focused." Id. at *5. The complainant's psychiatrist wrote a letter to the defendants requesting an exception to the no-pet rule and informed the defendants that "[d]ue to [the complainant]'s psychiatric condition, having a companion

18

animal would be ... necessary for her continued stabilization." Id. at *6. The court concluded that the complainant met her burden to establish that the reasonable accommodation was necessary. Kennedy House interprets Smith as showing that caring for oneself and keeping a regular routine are related to a psychological disability and that an accommodation may be necessary if the animal provides assistance directly related to that disability. Kennedy House argues that since Ms. Rubin's disability is physical and not psychological, and Mira provides no assistance to Ms. Rubin related to her physical disability, no nexus can be established.

Kennedy House also relies on Nason v. Stone Hill Realty Ass'n, No. 961591, 1996 WL 1186942, at *3 (Mass. Super. May 6, 1996) as further demonstrating how the courts interpret and apply the requirement of a nexus between the disability and the disability-related need for the assistance animal. In Nason, the Superior Court of Massachusetts,[9] did not grant a preliminary injunction to stop the defendant from evicting a complainant with multiple sclerosis (MS) from her apartment for violating the defendant's no-pet policy. Id. at *1. The complainant took in her sick mother's cat when her mother turned ill and was no longer able to care for herself or her cat. Id. After her mother died, the complainant kept the cat for herself and alleged that it assisted her with her MS. The defendant demanded that the cat be removed from the premises, and the complainant sought relief under the FHA and Massachusetts law. The court found that the complainant did not show "a substantial likelihood of proving that

---

[9] The Superior Court of Massachusetts, like this Court, is a state-wide court with both original and appellate jurisdiction. See Mass. Gen. Laws Ann. ch. 212, §§ 1-14. Nason was heard in the Superior Court's original jurisdiction.

19

maintaining possession of the cat is necessary due to her [disability]." Id. at *3. The court looked to whether the complainant provided evidence of a clear nexus between her MS and the need for the cat by assessing an affidavit from the complainant's neurologist that stated that removal of the cat would lead to "increased symptoms of depression, weakness, spasticity and fatigue." Id. The court concluded:

> [T]he affidavit does not demonstrate that such symptoms are treatable solely by maintaining the cat or whether another more reasonable accommodation is available to address [the complainant's] symptoms. For example, the affidavit fails to illustrate how the presence of the cat, as opposed to some other therapeutic method such as chemical therapy, is essential or necessary to treating her symptoms.
>
> This is not to say that there could be a basis on a fully developed record for a finder of fact to determine that keeping the cat is necessary given [the complainant's disability]. However, the record before the court fails to clearly demonstrate the nexus between keeping the cat and her handicap sufficient to warrant the court to intervene at this juncture of the litigation. The court will not assume or guess as to the nature of the connection between the cat and [the complainant's disability].

Id. Kennedy House argues that like the complainant in Nason, the note from Ms. Rubin's physician did not establish a nexus between that disability and the assistance that Mira provides. The note from Dr. Wynne addressed Ms. Rubin's mobility disability, and there is no evidence that Mira's assistance is related to Ms. Rubin's mobility.

### 2. Discussion

The difficulty presented is distinguishing between a disability-related need for an assistance animal and a beloved, and intuitive, pet. As described in the

HUD Notice, "[a]n assistance animal is not a pet. It is an animal that works, provides assistance or performs tasks . . . or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability." HUD Notice at 2. The distinction may be difficult to draw in some cases. However, based on the language in HUD's Interpretive Rule, and the cases, it is the burden of the individual with the disability to demonstrate a nexus between his or her disability and the function the service animal provides or, in other words, a connection to the disability-related assistance provided by the assistance animal. Under the specific facts in this case, we agree with Kennedy House that Ms. Rubin has not sufficiently met her burden of demonstrating a nexus between her disability and the assistance provided by Mira.

Where the nature of a disability and the need for disability-related assistance is apparent from the nature of the disability, no medical information is required. See HUD Notice at 4 (stating that "persons who are blind or have low vision may not be asked to provide documentation of their disability or their disability-related need for a guide dog").[10] However, where the nature of the disability and the need

---

[10] However, there may be times when the disability is apparent, but the need for the assistance animal is not. A Joint Statement by the Department of Justice and HUD provides the following example.

> A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

Reasonable Accommodations Under the Fair Housing Act, Joint Statement of the Department of Housing and Urban Development and the Department of Justice, May 17, 2004, ¶ 17, Example 2.

for disability-related assistance is not apparent, medical information can be required. According to joint guidance from the Department of Justice and HUD:

> A housing provider may not ordinarily inquire as to the nature and severity of an individual's disability. . . . However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. . . . Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability.

Reasonable Accommodations Under the Fair Housing Act, Joint Statement of the Department of Housing and Urban Development and the Department of Justice, May 17, 2004, ¶ 18.

In this case, the nature of Ms. Rubin's disability was not apparent,[11] and so she was asked to provide medical documentation. Her physician's March 10, 2011 letter to Kennedy House attested to Ms. Rubin's "medical issues that affect her **mobility**" and stated that Ms. Rubin "benefits from the support of a **service dog**." (R.R. at 154 (emphasis added).)

We agree with Kennedy House that the nexus that must be demonstrated is between the disability described in the medical information and the assistance

---

[11] Mr. Giblin testified that "at least to my knowledge," Ms. Rubin never brought Mira along on her visits to Kennedy House. (R.R. at 134.) Ms. Rubin testified that while she attended the Membership Committee meeting alone and left her wheelchair in the car, (Id. at 101, 123), she was in a wheelchair and accompanied by a caregiver at each visit she made to Kennedy House prior to the Membership Committee meeting. (Id. at 89.)

provided by the animal. Here, the medical information provided by her physician documented Ms. Rubin's issues with mobility; however, there is no question that Mira does not provide assistance to Ms. Rubin directly related to her mobility, the only disability documented by Dr. Wynne. Ms. Rubin explicitly stated that Mira **does not** assist her with her mobility; instead, Mira assists her by **reminding** her to take medications and **reminding** her to get out of bed. (R.R. at 112 (emphasis added).) It is Ms. Rubin, as the complaining party, that bears the burden of proving that an accommodation is necessary. Lapid-Laurel, 284 F.3d at 457. Because Ms. Rubin did not demonstrate a need for her assistance animal directly related to the disability described by her physician, we cannot conclude that Ms. Rubin satisfied her burden.

This interpretation is consistent with the cases cited by the parties, and others that we have found. Each case we have found involves evidence directly connecting the type of assistance provided by the animal with a disability described by a physician or other qualified expert. See Anderson v. City of Blue Ash, 798 F.3d 338, 361 (6th Cir. 2015) (concluding that, based on letter from the child's doctor, a reasonable factfinder could find an accommodation of a miniature horse necessary to alleviate a child's disabilities); Bhogaita v. Altamonte Heights Condo. Ass'n, Inc., 765 F.3d 1277, 1289 (11th Cir. 2014) (concluding based on a letter from complainant's doctor that a reasonable factfinder could conclude that the complainant's dog alleviates the symptoms of his post-traumatic stress disorder); Castellano v. Access Premier Realty, Inc., No. 1:15-CV-0407-MCE-KJS, 2016 WL 1588430, at *6 (E.D. Cal. Apr. 20, 2016) (concluding that the complainant's cat was necessary to alleviate the complainant's mental and physical ailments, based on a letter from the complainant's physician); Smith, 2013 WL

23

5786586, at *6 (holding that a letter from the complainant's psychiatrist established a nexus between the complainant's mental disability and a comfort dog); The Sec'y, United States Dep't of Hous. & Urban Dev., on Behalf of Durand Evan, Charging Party, Durand Evan, Intervenor, HUDALJ 09-93-1753-8, 1996 WL 657690, at *6 (Nov. 12, 1996) (finding that a complainant established that waiver of a defendant's no-pet policy was necessary based on letters from a physician and a licensed clinical social worker attesting to the therapeutic benefit of the complainant's cat).

The Commission determined that there was a sufficient nexus based on its factual finding that Ms. Rubin suffers from **chronic pain** that often makes it difficult for her to order her day. (FOF ¶ 21.) According to the Commission's findings: "Mira assists [Ms. Rubin] in ordering her day, in remembering when to take her medications, eat meals, get up and out of bed and otherwise reminding Ms. Rubin what she is supposed to be doing at any given time." (FOF ¶ 22.) The Commission further found that "[t]he nature and quality of Ms. Rubin's life would be materially disadvantaged if she were forced to live without an assistance animal." (FOF ¶ 27.) Based upon these findings, the Commission determined there was a nexus between Ms. Rubin's **chronic pain** and **Mira's assistance**. The Commission thus rendered the mobility-related disability described by her physician irrelevant to their analysis. There is no reason, under the Commission's interpretation, to require a complainant to provide a description of a disability from a physician if the disability so described is irrelevant to whether there is a disability-related need for assistance. We believe that in failing to consider whether the assistance was related to the mobility-related disability described by

24

Ms. Rubin's physician, and instead substituting a different disability, the Commission erred.

## IV.   CONCLUSION

In conclusion, because Ms. Rubin's physician described a disability related to her mobility, and there was no evidence establishing a nexus between her mobility-related needs and the requested assistance animal, Ms. Rubin did not meet her burden of proving that it was necessary for Kennedy House to waive its no-dog policy.  Accordingly, we reverse the Order of common pleas.[12]

_____
**RENÉE COHN JUBELIRER,** Judge

---

[12] Due to our disposition we need not address Kennedy House's substantial evidence arguments.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Kennedy House, Inc.,            :
                Appellant    :
                         :
          v.           :   No. 1263 C.D. 2015
                         :
Philadelphia Commission on   :
Human Relations            :

**O R D E R**

NOW, this 11th day of July, 2016, the Order of the Court of Common Pleas of Philadelphia County is **REVERSED**.

_____
**RENÉE COHN JUBELIRER,** Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kennedy House, Inc.,                          :
                    Appellant                 :
                                              :    No.  1263 C.D. 2015
            v.                                :
                                              :    Argued: May 12, 2016
Philadelphia Commission on                    :
Human Relations                               :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


DISSENTING OPINION BY
JUDGE McCULLOUGH                              FILED:  July 11, 2016


        I respectfully dissent because I believe that Jan Rubin, the applicant
seeking a housing accommodation from the Kennedy House, Inc. (Kennedy
House), presented sufficient evidence demonstrating a nexus between her disability
and the assistance provided by her dog Mira.

        Section 9-1108 of the Philadelphia Fair Practice Ordinance
(Ordinance) provides that "[i]t shall be an unlawful housing and real property
practice to deny or interfere with the housing accommodation, commercial
property or other real property opportunities of an individual or otherwise
discriminate based on his or her . . . disability . . . ."  Phila. Code §9-1108(1).
Section 9-1102(1)(e) of the Ordinance defines "discrimination" as follows:

        Any direct or indirect practice of exclusion, distinction,
        restriction,   segregation,   limitation,   refusal,   denial,

differentiation or preference in the treatment of a person on the basis of actual or perceived . . . disability . . . **or other act or practice made unlawful under this Chapter or under the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania**.

Phila. Code §9-1102(1)(e) (emphasis added).

Section 804(f) of Title VIII of the federal Civil Rights Act of 1968, commonly referred to as the Fair Housing Act (FHA), makes it unlawful to discriminate in the sale or rental of a dwelling against a person based on a disability. 42 U.S.C. §§3604(f)(1), (2). Discrimination under Section 804(f) of the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B).

As the Majority recognizes, Ms. Rubin suffers from numerous conditions, including "(1) degenerative disc disease at multiple levels of her spine; (2) spinal stenosis at multiple levels of her spine; (3) fibromyalgia; (4) chronic pain; and (5) central nervous system sleep apnea." (Slip op. at 2) (citing Philadelphia Commission on Human Relations (Commission) Decision, Findings of Fact (FOF) ¶13). The Majority also notes that these conditions affect Ms. Rubin's mobility and that said conditions and the pain associated therewith "often make[s] it difficult for her to order her day, to get out of bed, to remember to take her medications, and [to] do other simple tasks such as to take a shower, comb her hair[,] and get dressed." *Id.* (citing FOF ¶21).

In response to a request from Kennedy House, which maintained a no-dog policy and from which she sought a housing accommodation, Ms. Rubin submitted a letter from her primary care physician, Craig Wynne, M.D., stating that "[Ms.] Rubin has multiple medical issues that affect her mobility. She benefits

from the support of a service dog. She currently has a dog that serves this role for her. Please consider allowing [Ms. Rubin] to keep the dog. Loss of this animal would impair her ability to function." (Reproduced Record (R.R.) at 154.) Dr. Wynne also later submitted, again at the request of Kennedy House, a certification form verifying that Ms. Rubin was disabled and that the requested accommodation was "consistent with her needs associated with her disability." (Certification Form, Rubin Ex. 3.)

Ms. Rubin later explained at a Kennedy House Membership Committee meeting that her dog Mira assists her "in ordering her day, and in remembering when to take medications, eat meals, [and] get up and out of bed. . . ." (Slip op. at 4) (citing FOF ¶22). In her complaint filed with the Commission, Ms. Rubin alleged that Mira also provides her with "emotional support" when she is unable to leave the house for long periods of time. (Complaint ¶13.) In this complaint, Ms. Rubin also noted that Mira "would always be on a leash[,] . . . would avoid elevator cars with other residents[,] . . . would exit through the rear entrance instead of the lobby[, and p]ublic and private areas would be kept clean and odor free." (Complaint ¶35.)

Ms. Rubin reiterated the same in her testimony before the Commission. Ms. Rubin also offered testimony from Mira's veterinarian, Stephen Meister, D.M.V. Dr. Meister testified that he has served as Mira's veterinarian since 2007 or 2008 and currently sees Mira at Ms. Rubin's house. He noted that it was "well-documented" in the veterinary field that "in the elderly or disabled, emotional support animals provide tremendous help to them," especially in studies of depression and isolation. (FOF ¶25; R.R. at 71.) Dr. Meister explained that support animals "provide structure" in the lives of such people and encourage them

"to get up and move around and provide for the animal. . . ." *Id.* He stated that, based upon his personal observations, Ms. Rubin's disability had significantly worsened between 2008 and 2013 and that Mira assists Ms. Rubin with "what to do in normal situations," "lets her know when she needs to go out and when she needs to be consoled," and requires Ms. Rubin to be "as mobile as she possibly can." (FOF ¶26; R.R. at 72.)

The Commission credited the testimony of Ms. Rubin and Dr. Meister,[1] and concluded that "the record clearly establishes a nexus between the requested accommodation and Ms. Rubin's disability, as the dog Mira 'alleviates one or more identified symptoms or effects of [Ms. Rubin's] disability.'" (Commission Decision, Conclusion of Law ¶93.) The Court of Common Pleas of Philadelphia County (trial court) adopted the decision of the Commission as its own and held that the Commission's conclusions were based upon substantial evidence of record. I agree with the trial court that the record in this case, including the credited testimony discussed above, supports the Commission's conclusion that Ms. Rubin established a nexus between the requested accommodation and her disability.

However, the Majority concludes to the contrary that "there is no question that Mira does not provide assistance to Ms. Rubin directly related to her mobility; the only disability documented by Dr. Wynne." (Slip op. at 22-23.) I do not agree. The record establishes that Ms. Rubin has numerous, significant medical conditions, all of which contribute to her lack of mobility. Mira essentially assists Ms. Rubin in remembering to take her medications and

---

[1] The Commission also credited the testimony of James Giblin, General Manager of Kennedy House.

encourages her to get out of bed and take care of herself and Mira. I would conclude that this type of support directly relates to Ms. Rubin's mobility disability.

Moreover, both Kennedy House and the Majority cite to the case of *Smith v. Powdrill*, No. CV 12-06388 DDP RZx, 2013 WL 5786586 (C.D. Cal. Oct. 28, 2013), for support. In that case, the complainant, who suffered from various mental disabilities, sought a waiver of the defendant's no-pet rule as an accommodation for the same. Similar to Ms. Rubin, the complainant asserted that her companion dog helped her keep "a regular routine of caring for [her]self, motivates [her] to get out of bed, clean, maintain relationships with friends and family, and to exercise." *Id.* at *1. The complainant submitted a letter from her psychiatrist verifying these disabilities, which inhibited her "ability to take care of herself, get out of bed, interact with others and remain focused," *id.* at *5, and her need for a support animal. The court in that case concluded that the complainant had met her burden of establishing that the reasonable accommodation was necessary.

Kennedy House and the Majority seem to imply that "caring for oneself and keeping a regular routine," (slip op. at 19), are strictly related to a psychological disability and require proof thereof in order to establish the necessary nexus for an accommodation. However, I do not believe that the nature of the disability, i.e., mental or physical, is controlling. In other words, it should not matter whether a person needs an accommodation for a mental or physical disability. Rather, the question in these cases is nexus and the sufficiency of the evidence presented by the person seeking the accommodation. In this case, both

the Commission and the trial court concluded that Ms. Rubin had presented sufficient evidence to meet her burden and the record supports this conclusion.

Hence, I would affirm the order of the trial court denying Kennedy House's statutory appeal.

_____
PATRICIA A. McCULLOUGH, Judge