IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Housing Authority, :
                 Petitioner :
 :
         v. : No. 907 C.D. 2024
 :
Pennsylvania Human Relations : Submitted: July 7, 2025
Commission, :
             Respondent :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE STACY WALLACE, Judge
                HONORABLE MARY HANNAH LEAVITT, Senior Judge


OPINION
BY JUDGE McCULLOUGH              FILED: December 11, 2025

Reading Housing Authority (Petitioner) petitions for review of the June 17, 2024 order entered by the Pennsylvania Human Relations Commission (Commission) directing it to cease and desist from denying a reasonable accommodation to tenants who have requested accessible parking and ordering it to pay Dorisel M. Serrano Rodriguez (Complainant) $20,000.00 in compensatory damages as a result of Petitioner's violation of Section 5(h)(3.2) of the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(h)(3.2).[1] On appeal, Petitioner challenges the Commission's determination that

---

[1] Section 5(h)(3.2) of the Act prohibits any person from refusing "to make reasonable accommodations in rules, policies, practices or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a housing accommodation." 43 P.S. § 955(h)(3.2).

it violated Section 5 the Act, contends that Complainant's discrimination claim is barred by the applicable statute of limitations, and asserts that Complainant suffered no damages as a result of not having an accessible parking space. Upon careful review, we affirm.

### Background

The relevant facts and procedural history of this case are as follows. On August 7, 2018, Complainant and her husband Juan Torres Mendez (Husband) entered into a lease with Eisenhower Apartments, a high-rise property owned by Petitioner housing elderly and non-elderly disabled tenants (Property). The Property contains 156 apartment units and 17 parking spaces, 3 of which are designated as handicap spaces. Petitioner maintains a waiting list for both types of parking spaces, handicapped and non-handicapped requests, and it assigns spaces to residents as they become available on a first-come, first-serve basis for each list. Specifically,

> [t]here are 17 parking spaces, 3 of which are marked as handicapped (or "accessible") spaces. [Petitioner] maintains a waiting list for parking whereby individuals who have been approved for an accessible space are identified with an "H" next to their names. Those with an "H" designation are also listed in a separate "Handicap" section of the list. The names and order of the individuals with the "H" designation are the same on both lists.

> It is largely undisputed that [Complainant] is a person with a disability, and that [Petitioner] knew of her disability. At the public hearing, [Complainant] testified that she had six ruptured discs in her spine, fibromyalgia, a dislocated hip, carpal tunnel in both hands, a "messed up" right knee, and experienced swelling in her feet, water retention, and difficulty walking. She shared that these impairments limited her ability to walk and her ability to lift objects without them falling.

(Hearing Commissioner Op., at 10) (record citations omitted).

2

On August 7, 2018, upon execution of the lease, Complainant, by and through Husband, requested an accessible parking space with Petitioner. *Id.* at 3. When Complainant, by and through her Husband, requested an accessible parking space, they were placed as next in line on both waiting lists. *Id.*

On January 8, 2021, Complainant by and through Husband, made a second request for assignment of a handicap parking space by completing a Petitioner's Request for Reasonable Accommodation Form. In a letter dated February 19, 2021, Resident Services Director Jack Knockstead acknowledged receipt of the request and of a letter submitted by Complainant's physician, Brian L. Fellechner, D.O., indicating that Complainant is "limited in ability to walk community distance." (J. Knockstead Letter, 2/19/21.) Mr. Knockstead explained:

> I understand that you are currently on the waiting list for a parking space and have requested a handicapped parking space. It appears that you are requesting a parking space to be positioned above other residents on the waiting list to receive a handicapped parking space. Parking is not provided for all residents. Parking is an amenity and not a guarantee. It is not an essential service provided by Reading Housing Authority; this request is not a fundamental service of the housing program and is therefore denied.

*Id.* Complainant filed an appeal from the determination with Petitioner.

By letter dated May 13, 2021, Mr. Knockstead indicated he had reviewed Complainant's appeal, that immediate assignment of a parking space was not possible, and that Complainant, by and through Husband, would remain on the waitlist.[2] *See* Hearing Commissioner Finding of Fact ¶ 13. He explained:

---

[2] Although Petitioner addressed this letter to Husband, a review of the record shows that Petitioner essentially used Husband's name as a placeholder on the waiting lists as head of household for the couple. (*See* Notes of Testimony (N.T.) 11/08/23, at 81) (testimony of Petitioner's executive **(Footnote continued on next page…)**

I have received the request to appeal the reasonable accommodation denial for a handicapped parking space for the disability-related needs of your spouse, [Complainant].

. . . .

In review of your request, it is the finding of our agency administration that your request has in fact already been approved, based upon your placement on the parking list, and therefore no grievance hearing is necessary.

Please note that your desire for an immediate parking space is unattainable, as there are no available parking spaces, and to accommodate your request, we would need to displace a household who already has parking. This is not action that our organization will consider because as noted, all persons assigned a space in this limited parking are persons who, like yourself, are also elderly or who have a disability.

(J. Knockstead Letter, 5/13/21.)

On June 7, 2021, Complainant filed a complaint with the Commission alleging that Petitioner discriminated against her because of her disability by denying her reasonable accommodation request for an accessible parking space (Complaint). Complainant averred that she requested an accessible parking space on December 2, 2020, and provided Petitioner with a note from her physician advising that her physical disability prevented her from walking long distances. Complainant listed the dates of discrimination as beginning and ending on December 2, 2020. However, she also

---

director explaining that letter addressing Complainant's request was addressed to Husband as head of household).

checked a box next to this date indicating that the discrimination was "Continuing." (R.R. at 126a.)[3]

Commission staff investigated the Complaint and found probable cause to credit Complainant's allegations of discrimination. After attempts to resolve the case through conciliation failed, a hearing commissioner conducted a public hearing on November 8, 2023, at which she heard testimony from Complainant[4] and Petitioner's executive director, Stacy Keppen. Complainant testified that her disabilities, including six ruptured spinal discs, fibromyalgia, a dislocated hip, a knee injury, and feet swelling, make it difficult for her to walk. (N.T. Hearing, 11/08/23, at 26-27.) A letter from Dr. Fellechner dated December 2, 2020, was admitted into evidence corroborating this testimony, stating: "[Complainant] suffers from a multitude of disabling conditions which made prolong standing and ambulating difficult and painful" and opining that she "should be afforded the closest parking space available to her residence as possible." (Joint Exhibit 3.)

Complainant testified that Husband does the majority of the driving for their household for activities such as grocery shopping and medical appointments. Complainant averred that they requested accessible parking when they moved into the Property in August of 2018, and later renewed this request in 2021. (N.T. Hearing, at 29.) On their outings, Husband would typically find a parking space a few blocks away from the Property while she waited for him at the building. *Id.* at 30. Complainant stated that waiting for Husband "affected [her] a lot because not having that parking . . . gave [her] a lot of back pain and hip pain." *Id.* at 32. She indicated that this experience

---

[3] It is clear from the record that on August 7, 2018, upon execution of the lease, Complainant, by and through Husband, first requested an accessible parking space. (Hearing Commissioner Op., at 3.)

[4] Complainant is a native Spanish speaker and used the assistance of an interpreter at the hearing.

5

over a five-year period caused her anxiety, depression and stress. *Id.* at 33. Claimant averred that while she and Husband were on the waiting lists for parking, Petitioner "kept skipping [them] on the list and giving it to other people." *Id.* at 35.

Ms. Keppen testified that she has worked for Petitioner in various capacities since 1998 and became its executive director in 2019. She relayed that Petitioner regularly receives requests for reasonable accommodations from its tenants, approximately 100 per year. *Id.* at 62. Ms. Keppen explained that because there are 156 units at the Property and only 17 total parking spaces, each unit cannot be assigned a space and that Petitioner has always used the waitlist system to assign available spaces. Petitioner's records reflect that Husband's position on both the general and handicap waiting lists steadily moved up until he was assigned an accessible space in May of 2023. Ms. Keppen explained that because the Property houses elderly and non-elderly disabled tenants, the 14 general parking spaces are used by older adults and by persons with disabilities. *Id.* at 74-75. On cross-examination, **Ms. Keppen acknowledged that six individuals without Handicapped designations received general parking spaces before Husband was assigned an accessible parking space**. *Id.* at 89. She testified in this regard as follows:

> Q. So according to this chart, **six individuals without H[andicap] designations** received parking on or before – I'm sorry, not on or before - **received general parking spaces before Complainant**. Correct?
>
> A. **Correct**.

*Id.* (emphasis added).

The hearing commissioner thereafter issued findings of fact, conclusions of law, an opinion and a recommended disposition concluding Complainant had established Petitioner discriminated against her by denying her request for a reasonable

6

accommodation in violation of Section 5(h)(3.2) of the Act. The hearing commissioner recommended an award of $20,000.00 in compensatory damages for the humiliation and embarrassment Complainant suffered as a result of Petitioner's discriminatory conduct. In doing so, the hearing commissioner explained:

> In the instant case, a clear nexus is established between [Complainant's] reasonable accommodation request and her disability. Complainant testified at hearing about her disability and associated limitations on mobility due to ruptured spinal discs, fibromyalgia, carpal tunnel, a dislocated hip, water retention, and swelling of feet. She testified that these ailments substantially limit her ability to walk, bend over, or even move at times. Her testimony is corroborated by the letter provided by Dr. Brian Fellechner, who states that Rodriguez "should be afforded the closest parking space as possible. She suffers from a multitude of disabling conditions which make prolonged standing and ambulating difficult and painful."

> [Complainant] also provided testimony on the challenges with being disabled and not having an accessible parking space. She testified that her husband did most of the driving, but that she also had a driver's license and would sometimes be unable to drive due to her disability. Without an accessible parking space, [Complainant] and her husband had to park outside of her building which was at a farther distance from her home. [Complainant] testified that sometimes her husband would have to circle the block repeatedly if parking was unavailable, or park multiple blocks away from her home so [Complainant's] husband would often drop her off at a designated 20 minute drop off spot at the apartments in order to remove any purchases out of the car before looking for parking. During one of those times, [Complainant] and her husband returned from their car to find that it had been towed. [Complainant] testified that when her husband was not able to readily find parking, she "usually would arrive at the apartment with a lot of pain." Lack of accessible parking contributed to added hip and back

7

pain for [Complainant], and she testified to experiencing anxiety and stress related to the parking situation. [Complainant] was subject to the risk of added pain, injury, and stress directly stemming from the lack of an accessible parking space, and it is clear that provision of a parking space was necessary to provide [Complainant] the equal opportunity to use and enjoy her dwelling.

. . . .

We add that although [Complainant] did eventually receive parking, Respondent's failure to accommodate [Complainant] upon her showing of necessity until almost 5 years after her initial request amounts to a denial and rendered [Complainant] unable to participate in her right to equal enjoyment of her property. Complainant, by and though her [H]usband, requested an accessible parking space and was added to the waiting list on August 7, 2018. She received an accessible parking space on May 22, 2023, approximately 4 years and 9 months from the date that she made the initial reasonable accommodation request. **In the 4 years and 9 months that Complainant was on the waiting list for parking, 6 individuals who had not requested an accessible space received parking before Complainant**. We agree with Complainant that such a delay in receiving a necessary and reasonable accommodation amounted to a denial, **even more so considering the fact that a number of individuals without an "H" [Handicap] designation were afforded a closer parking space in that time**.

(Hearing Commissioner Op., at 13-15) (most case citations omitted; emphasis added).

On June 17, 2024, the Commission approved the hearing commissioner's findings of fact, conclusions of law, and opinion and entered an order directing Petitioner to cease and desist from denying a reasonable accommodation to tenants who follow its reasonable accommodations process to request accessible parking. The Commission additionally ordered Petitioner to pay Complainant $20,000.00 in

8

compensatory damages and to attend fair housing training.  This petition for review followed.[5]

## Issues

Petitioner challenges the Commission's determination that it violated Section 5(h)(3.2) of the Act where the evidence fails to prove Complainant's request for an accessible parking space was a necessary and reasonable accommodation, given the Property's parking constraints and its elderly and disabled population.  Petitioner additionally argues that Complainant's discrimination claim is barred by the applicable statute of limitations provision,[6] and that the damage award of $20,000.00 was not warranted because Complainant suffered no damages as a result of the parking space issue.

We begin by discussing the timeliness of the Complaint, as our disposition of that issue controls whether we may address Petitioner's remaining arguments on the merits.

## Discussion

### Timeliness of the Complaint

Petitioner contends Complainant's discrimination claim is time barred because she failed to file her Complaint within the 180-day statute of limitations period

---

[5] Our standard of review "of a Commission determination is limited to deciding whether it is in accordance with the law, whether constitutional rights have been violated, and whether the Commission's findings are supported by substantial evidence in the record." *Garner v. Pennsylvania Human Relations Commission*, 16 A.3d 1189, 1197 n.3 (Pa. Cmwlth. 2011).

[6] *See* 43 P.S. § 959(h) (setting 180-day statute of limitations period for complaints alleging a violation of the Act.)

prescribed by Section 9(h) of the Act, 43 P.S. § 959(h).[7]  Petitioner maintains that because Complainant filed her Complaint on June 7, 2021, and therein identified December 2, 2020, as the only date of discrimination, she filed her claim 6 days past the statutory deadline.  (Petitioner's Br., at 20-21.)

It is axiomatic that the purpose of statute of limitations provisions is to prevent the litigation of stale claims in our courts.  *Girard Finance Company v. Pennsylvania Human Relations Commission*, 52 A.3d 523, 532 (Pa. Cmwlth. 2012).  As noted, Section 9(h) of the Act requires that "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination[.]"  43 P.S. § 959(h).  A complainant must therefore file a complaint based on a discrete act of discriminatory conduct within the 180-day time limit prescribed in the Act, or lose the ability to recover for it.  *Foust v. Pennsylvania Department of Human Services*, 305 A.3d 1128, 1135 (Pa. Cmwlth. 2023).  However, despite this statutory time bar, a complainant can pursue a claim under the Act for conduct occurring outside this 180-day period if it is part of an **ongoing** pattern or practice.  *Neshaminy School District v. Pennsylvania Human Relations Commission*, 257 A.3d 766, 784 (Pa. Cmwlth. 2021).  "This is because where the challenged violation is a continuing one, the staleness concern disappears."  *Id.*  Accordingly, where a complainant "challenges not just one incident of conduct, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice."  *Id.*

Here, while the Complaint identified December 2, 2020, as the beginning and end date of Petitioner's discriminatory conduct, Complainant also indicated that

---

[7] Because this appeal involves the interpretation of a statute of limitations provision raising a question of law, our standard of review is *de novo* and our scope of review is plenary.  *KEM Resources, LP v. Deer Park Lumber, Inc.*, 310 A.3d 142, 153 (Pa. 2024).

this conduct was ongoing by checking the accompanying "Continuing" checkbox next to the date. (R.R. at 126a.) Further, when considering the allegations in the Complaint in the context of the evidence presented as a whole, it is clear that Complainant was not alleging an isolated act of discrimination, but rather a sustained practice of this conduct from the time she moved to the Property in 2018. This practice remained ongoing at the time Complainant filed the Complaint, with the last affirmative occurrence on May 13, 2021, when Petitioner issued a letter stating that immediate assignment to a parking space was impossible and Husband would remain on the waiting lists. Thus, because Complainant filed her Complaint well within 180 days of the last asserted occurrence of Petitioner's practice, her claim is timely and is not barred by the statute of limitations. *See Neshaminy School District*, 257 A.3d at 784. We therefore turn to our merits analysis.

## Section 5 Violation

Petitioner challenges the Commission's finding that it violated Section 5 of the Act where Complainant failed to meet her initial burden of proving that an accessible parking space was necessary to her use and enjoyment of her residence. Petitioner highlights the Property's parking constraints, its notification to all residents that parking is an amenity and not a guarantee, and the fact that Husband's name was placed on the waitlists in accordance with its longstanding parking assignment system. Alternatively, Petitioner contends that even if Complainant had met this burden, her request for a parking accommodation was nevertheless unreasonable given that the Property has only 17 parking spaces and altering its waitlist system would cause harm to its other tenants, all of whom are elderly and/or disabled.

We begin our analysis mindful that Section 12(a) of the Act requires that its provisions be liberally construed in order to accomplish its purpose of combating

the practice of discrimination against individuals by reason of their race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability. 43 P.S. §§ 952, 962(a). This Court therefore employs a construction which is both consistent with the language of the statute and best promotes its goal of ensuring equal opportunities. *1400 Main Holdings, LLC v. Pennsylvania Human Relations Commission*, 326 A.3d 1040, 1041 (Pa. Cmwlth. 2024). As previously stated, under Section 5 of the Act, it is an unlawful discriminatory practice to: "[r]efuse to make reasonable accommodations in rules, policies, practices or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a housing accommodation." 43 P.S. § 955(h)(3.2). This statutory provision is supplemented by Section 45.5(b) of the Commission's regulations, which provides:

> A person may not deny a person with a handicap or disability the opportunity to use, enjoy or benefit from housing accommodations or commercial property subject to the coverage of the [Act] if the basis of the denial is the need for the reasonable accommodations. (1) A person may not refuse to make reasonable accommodations in rules, policies, practices and procedures when the accommodations may be necessary to afford a person with a handicap or disability equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

16 Pa. Code § 45.5(b).

When adjudicating a discriminatory complaint, Pennsylvania courts look to corollary federal law and "construe the [Act] in light of principles that have emerged from federal precedent interpreting federal antidiscrimination statutes, particularly Title VII of the Civil Rights Act of 1964 (Title VII)." *Foust,* 305 A.3d at 1133. "Although the [Act] is a state statute that exists independently of its federal counterparts, the Pennsylvania Supreme Court has chosen to harmonize its construction

12

of the [Act] with decisions interpreting federal antidiscrimination statutes that address the same concerns." *Id.* (internal quotation marks omitted).

Instantly, Section 5(h)(3.2) of the Act is nearly identical to the relevant provision contained in Section 804(f) of Title VIII, commonly referred to as the Fair Housing Act (FHA), which makes it unlawful to discriminate against a person in the sale or rental of housing based on a handicap. 42 U.S.C. § 3604(f). Specifically, Section 804(f)(3)(B) of the FHA makes it unlawful to "refus[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B). Thus, this section "requires that an accommodation be granted when it is reasonable and necessary to afford handicapped persons an equal opportunity to use and enjoy housing." *Carunchio v. Swarthmore Borough Council*, 237 A.3d 1183, 1197 (Pa. Cmwlth. 2020). "Discrimination challenges for failure to make reasonable accommodations under the FHA[] are analyzed using the burden-shifting framework developed by the Third Circuit [Court of Appeals] in *Lapid-Laurel,* [*L.L.C. v. Zoning Board of Adjustment of the Township of Scotch Plains*, 284 F.3d 442, 457 (3d Cir. 2002)]: the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Id.* (internal quotation marks omitted).

This Court has also held that in order for a plaintiff to satisfy the "necessary" element of the statute, she "must demonstrate a direct linkage between the proposed accommodation and the 'equal opportunity' to be provided." *Kennedy House, Inc. v. Philadelphia Commission on Human Relations*, 143 A.3d 476, 486 (Pa.

Cmwlth. 2016). We explained that "if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary" for purposes of the Act. *Id*. (emphasis omitted). With respect to the defendant's required showing of unreasonableness if the burden shifts, this inquiry is highly fact-specific, requiring a case-by-case determination and must be considered "in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose." *Lapid-Laurel*, 284 F.3d at 462.

Here, the record before the Commission reflects that Complainant suffers from numerous medical conditions, including six ruptured spinal discs, fibromyalgia, a dislocated hip, a knee injury, and swollen feet. Complainant's treating physician has opined that her medical issues affect her mobility, make it difficult for her to walk, and that an accessible parking space would help to ameliorate these conditions. Claimant testified that the lack of accessible parking at her residence over a five-year period exacerbated her back and hip pain and caused her to experience anxiety, depression and stress.

Based on the foregoing, we conclude that the Commission's finding that Complainant presented sufficient evidence to demonstrate a nexus between her disability and her requested accommodation of an accessible parking space and that the burden therefore shifted to Petitioner to establish that the accommodation was unreasonable. *See Carunchio*, 237 A.3d at 1200. As the Commission found, the record reflects that although Petitioner did place Husband on its waiting lists in 2018 when the couple moved to the Property, the household was not assigned an accessible parking space until May of 2023, nearly 5 years later. During this time period, six individuals without Handicapped designations received a parking space before Complainant,

14

despite her repeated requests for an accessible space and her physician's submission of a letter opining that this accommodation was medically necessary due to her disability. Additionally, as the Commission noted with respect to Petitioner's assertion that parking is an amenity and not a guarantee, its claims:

> [do not] change the fact that [Petitioner] had a duty to make a reasonable accommodation upon request and the requisite showing of disability and necessity. . . . The Court in *Shapiro v. Cadman Towers, Inc.*, 51 F. 3D 328 (1995) cited 24 C.F.R. § l00.204(b), a regulation promulgated by HUD that provides an example of a "reasonable accommodation" under the FHA[]. The example states that the **duty to make "reasonable accommodations" obligates building management to reserve a parking space for a mobility-impaired tenant near that tenant's apartment.** *Id.* Per the court in *Shapiro*, this regulation "makes it clear that the use and enjoyment of a parking space cannot be considered in isolation from the tenant's ability to use and enjoy her dwelling place, a right specifically protected by the FHAA." *Id.*

(Hearing Commissioner Op., at 14) (emphasis added).

Based on the foregoing, we agree with the Commission's conclusion that Petitioner failed to meet its burden of showing the parking accommodation Complainant requested because of her disability was unreasonable. Accordingly, Petitioner's challenge to the Commission's finding that it violated Section 5 of the Act merits no relief.

### Damages

Lastly, Petitioner contends the Commission's award of $20,000.00 in compensatory damages to Claimant for her alleged embarrassment and humiliation was not supported by the evidence, which instead demonstrated that she suffered no damages as a result of the parking space issue. Petitioner highlights the fact that

15

Husband, not Complainant, did the driving for the household, and that he handled parking their vehicle while Complainant waited for him at the building entrance.

Section 9(f)(1) of the Act governs the remedies the Commission may provide for unlawful discrimination and states in relevant part as follows:

> If, upon all evidence at the hearing, the Commission shall find that the respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the Commission shall state its findings of fact, and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, . . . the making of reasonable accommodations . . . and, in those cases alleging a violation of Sections 5(d) or h or 5.3, where the underlying complaint is a violation of Section 5(h) or 5.3, **the Commission may award actual damages, including damages caused by humiliation and harassment, as, in the judgment of the Commission, will effectuate the purposes of this act**, and including a requirement for report of the matter of compliance.

43 P.S. § 959(f)(1) (emphasis added).

"Damage awards under the [Act] serve a dual purpose: to discourage discrimination and to restore the injured party to his or her pre-injury status." *1400 Main Holdings*, 326 A.3d at 1042. "The goal of the [Act] is to make persons whole for injuries suffered as a result of the discrimination, and the Commission's authority to fashion remedies is entitled to great deference." *Id.* Once a finding of discrimination is made, the decision as to the appropriate amount of a damage award is extremely fact-specific, and evidence concerning the nature of the discriminatory conduct and the victim's reaction thereto must be considered. *Canal Side Care Manor, LLC v. Pennsylvania Human Relations Commission*, 30 A.3d 568, 575 (Pa. Cmwlth. 2011).

16

The Commission may award damages for embarrassment and humiliation, which encompasses emotional distress, and when "determining whether the evidence of emotional distress is sufficient to support an award, we look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused the distress." *1400 Main Holdings*, 326 A.3d at 1045. A complainant's own testimony concerning the embarrassment and humiliation experienced can be sufficient in and of itself to support an award for compensatory damages. *Girard Finance Company v. Pennsylvania Human Relations Commission*, 52 A.3d 523, 536 (Pa. Cmwlth. 2012). Additionally, because the legislature has granted broad remedial powers to the Commission to address the issue of discrimination, our standard of review on appeal is very narrow and we may reverse its damages award only if we determine that it is an attempt to achieve ends other than the stated purpose of the Act. *Id.*

Instantly, as detailed above, the record establishes that Complainant has been diagnosed with several disabling conditions that make ambulating and prolonged standing difficult and painful. The letters written by Complainant's treating physician corroborated her testimony on this point and he opined that it was imperative that she be assigned an accessible parking space. Complainant averred that her hip and back pain were exacerbated while she waited for her Husband to locate parking and that the experience over a several year period caused her to experience emotional distress in the form of anxiety, depression and stress. In light of the foregoing, we conclude that the Commission's award of compensatory damages is amply supported by the record and is in line with the remedial purposes of the Act. Petitioner's argument to the contrary merits no relief.

17

## Conclusion

In sum, we conclude that Complainant's discrimination claim against Petitioner for its failure to grant her request for a parking accommodation was timely filed and is not barred by the applicable statute of limitations. The Commission's finding that Petitioner violated Section 5 of the Act by declining to assign Complainant an accessible parking space and that six people without Handicapped designations received parking spaces before Complainant despite her repeated requests over a protracted time period, is supported by substantial evidence in the record, as is the Commission's determination that a compensatory damage award of $20,000.00 is an appropriate remedy for the embarrassment and humiliation she suffered under the circumstances of this case. Accordingly, we affirm the order of the Commission.

_____

PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Housing Authority,               :
                  Petitioner               :
                                   :
                  v.               :    No. 907 C.D. 2024
                                   :
Pennsylvania Human Relations               :
Commission,               :
                  Respondent               :

## ***ORDER***

AND NOW, this 11th day of December, 2025, the June 17, 2024 order entered by the Pennsylvania Human Relations Commission directing the Reading Housing Authority (Petitioner) to cease and desist from denying a reasonable accommodation to tenants who have requested accessible parking through its reasonable accommodations process; ordering Petitioner to pay Dorisel M. Serrano Rodriguez (Complainant) $20,000.00 in compensatory damages; and directing it to attend fair housing training is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Reading Housing Authority, : 
             Petitioner : 
              : 
           v. :    No. 907 C.D. 2024
              :    Submitted: July 7, 2025
Pennsylvania Human Relations : 
Commission, : 
            Respondent : 

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

DISSENTING OPINION
BY SENIOR JUDGE LEAVITT           FILED:  December 11, 2025

       The Pennsylvania Human Relations Commission (Commission) awarded $20,000 in actual damages to Dorisel M. Serrano Rodriguez (Complainant), under authority of Section 9(f)(1) of the Pennsylvania Human Relations Act (Act).[1] Reading Housing Authority (Authority) contends that Complainant did not meet her burden of proving actual damages for humiliation and embarrassment, and I agree.[2]

---

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §959(f)(1).

[2] On appeal, the Authority contends that the Commission erred in holding that it committed discrimination. The Authority explains that it offers residential housing but without any guarantee of convenient parking. It has 17 parking spaces to serve 156 apartment units in the building where Complainant lived. Of the 17 spaces, 3 are reserved for handicapped parking.

      The Authority responded to Complainant's request for a parking accommodation by placing her on the waiting list for one of the three spaces. It explained that it could not "displace a household who already has parking. This is not action our organization will consider because, as noted, all persons assigned a space in this limited parking are persons who, like yourself, are also elderly or have a disability." Reproduced Record at 130a (R.R. __). The Authority explained that it had previously considered eliminating any assigned parking, which would make all spaces "available to any resident who possesses a handicapped placard from the Pennsylvania Department of Transportation (PennDOT)." *Id*. However, the citywide resident association expressly, indeed "vehemently," opposed this model. *Id*. at 139a.

The absence of any standards in Section 9(f)(1) to guide the Commission's exercise of discretion requires a strict and narrow application of the award of such damages. With respect, I dissent from the majority's decision to affirm the Commission's adjudication.

> Section 9(f)(1) of the Act provides, in part, as follows:
>
> If, upon all the evidence at the hearing, the Commission shall find that a respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the Commission shall state its findings of fact, and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, reimbursement of . . . *verifiable, reasonable out-of-pocket expenses caused by such unlawful discriminatory practice*, provided that, in those cases alleging a violation of section 5(d), (e) or (h) or 5.3 where the underlying complaint is a violation of section 5(h) or 5.3, *the Commission may award actual damages, including damages caused by humiliation and embarrassment*, *as, in the judgment of the Commission*, *will effectuate the purposes of this act*, and including a requirement for report of the manner of compliance.

43 P.S. §959(f)(1) (emphasis added).  Section 9(f)(1) does not define "actual damages," and it does not place any limit upon "the judgment of the Commission" in awarding damages, either as to amount or evidence required.  By contrast, the Act requires "verifiable" expenses to support an order of reimbursement.  43 P.S. §959(f)(1).

The award of "actual" or compensatory damages, governed by the common law, is a judicial function.[3]  *Paves v. Corson*, 801 A.2d 546, 548 (Pa. 2002)

---

[3] In *Bailets v. Pennsylvania Turnpike Commission*, 181 A.3d 324 (Pa. 2018), our Supreme Court considered the meaning of "actual damages" as used in the Whistleblower Law, Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §§1421-1428.  It concluded such damages were not limited to economic losses but also included "non-economic losses such as humiliation,

MHL-2

(quoting *Gradel v. Inouye*, 421 A.2d 674, 680 (Pa. 1980)) ("the duty of assessing damages is within the province of the jury"). Routinely, administrative agencies order payment of civil penalties and, in some cases, restitution. *See*, *e.g.*, Section 605(a) of the Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §691.605(a) (authorizing state agency "to assess a civil penalty" for violation of statute, regulation or permit issued under the Clean Streams Law); Section 1312(a) of the Public Utility Code, 65 Pa. C.S. §1312(a) (authorizing Public Utility Commission to order utility "to refund the amount in excess" of utility's tariff). However, where a statute creates a remedy in the form of common law damages, their award is appropriately committed to the judiciary. *See*, *e.g.*, Section 302(c) of the Older Adults Protective Services Act, Act of November 6, 1987, P.L. 381, *as amended*, 35 P.S. §10225.302(c) ("Any person who violates this subsection is subject to a civil lawsuit by the reporter or the victim wherein the reporter or victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater."). Allowing the Commission to award compensatory damages invades the province of Pennsylvania's judiciary.

In *Walnut Creek Manor v. Fair Employment & Housing Commission*, 814 P.2d 704, 729 (Cal. 1991), the California Supreme Court held that the Department of Fair Employment and Housing Commission's award of compensatory damages for emotional distress to a victim of housing discrimination violated the California Constitution's judicial powers clause. CAL. CONST., art. VI, §1.[4] The court described the award of damages for "the intangible and

---

embarrassment, loss of reputation and mental anguish in addition to any other remedies available under the law." *Bailets*, 181 A.3d at 335. Notably, damages under the Whistleblower Law are awarded only in a civil action filed in a court of law.

[4] Amendments to the California statute now permit either party to remove the administrative proceeding to a state court. The California Supreme Court thereafter held that the Department's

nonquantifiable injury to his or her psyche suffered as a result of the respondent's unlawful acts," as indistinguishable from a private tort action that belongs in a court of law. *Walnut Creek Manor*, 814 P.2d at 729.

The other problem with Section 9(f)(1) of the Act is that "the General Assembly cannot delegate 'to any other branch of government or to any other body or authority' the power to make law." *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827, 833 (Pa. 2017) (quoting *Blackwell v. State Ethics Commission*, 567 A.2d 630, 636 (Pa. 1989)). The non-delegation doctrine requires the legislature to make the basic policy choices and provide the "standards which will guide and restrain the exercise of the delegated administrative functions." *Protz*, 161 A.3d at 834.

Section 9(f)(1) of the Act lacks any standards to guide and restrain the Commission in its award of damages. Accordingly, even assuming that the award of damages for emotional distress is a function that can be transferred from the judiciary to an administrative agency, Section 9(f)(1), as drafted, violates the non-delegation doctrine.

---

authority to award emotional distress damages to housing discrimination complainants – in light of the judicial option provision – does not violate the judicial powers clause. *Konig v. Fair Employment and Housing Commission*, 50 P.3d 718, 726 (Cal. 2002).

In an effort to provide the standards omitted by the legislature, the Commission has promulgated its "Damage Calculation Guidance."[5] *See* https://www.pa.gov/content/dam/copapwp-pagov/en/phrc/non-discrimination/phrc%20damages%20guidance%20-%20august%202024%20final%20approved.pdf (last visited December 10, 2025). This guidance states in relevant part, as follows:

### 5. GUIDANCE HUMILIATION & EMBARRASSMENT DAMAGES

Pennsylvania Appellate Courts have not articulated a framework to be used for evaluating damages caused by humiliation and embarrassment. *Humiliation and embarrassment are somewhat synonymous with emotional distress*. The Commission adopts the below framework to evaluate these damages.

**Damage Range:** $5,000 to $35,000

This amount is appropriate to award in cases where Complainant describes their reaction to unlawful discrimination with *general vague descriptions of emotional distress, humiliation, and/or embarrassment*. Testimony of Complainant is typically unsupported by witness/es testimony or medical corroboration.

. . . .

The following factors, if present, will generally be found to increase the effect of discrimination on Complainant within each tier:

(1) Egregiousness of Respondent's behavior towards Complainant;

(2) Whether Complainant suffered physical harm or threat of physical harm in addition to harm to their mental health;

---

[5] This guidance is a general statement of policy, the purpose of which is to announce the Commission's "tentative intentions for the future." *Pennsylvania Human Relations Commission v. Norristown Area School District*, 374 A.2d 671, 679 (Pa. 1977). It does not establish a "binding norm." *Id*.

MHL-5

(3) The nature of the evidence offered to describe the harm (e.g. testimony by Complainant, testimony by others, expert testimony);

(4) Whether the discrimination was a single act or was ongoing; and

(5) Whether Complainant was particularly susceptible to being injured by discrimination due to their personal history. In this case, damages will be awarded to reasonably compensate Complainant for the effect on their pre-existing condition.

The factors described above are not an exclusive list. The value of Complainant's injuries may be established by testimony or documentary evidence and/or inferred from the circumstances.

Commission Guidance at 3-4, ¶5 (emphasis added). The existence of this guidance, in itself, demonstrates the shortcomings of Section 9(f)(1) of the Act.[6]

The issue of whether Section 9(f)(1) of the Act complies with the separation of powers mandated by our Pennsylvania Constitution was not raised by the Authority in its appeal. However, the construction and application of the phrase "award actual damages, including damages caused by humiliation and embarrassment, *as in the judgment of the Commission, will effectuate the purposes of this act*" is before the Court. 43 P.S. §959(f)(1) (emphasis added). The award of actual damages functions as a sanction because they are available only where they will deter violations of the Act. The Statutory Construction Act of 1972 requires "penal provisions" of a statute to be "strictly construed." 1 Pa. C.S. §1928(b)(1). As such, Section 9(f)(1) must be narrowly construed.

---

[6] The amount of Complainant's award, less than $35,000, indicates that the Commission considered her reaction to discrimination to be supported, at best, by "general vague descriptions of emotional distress, humiliation and/or embarrassment." Commission Guidance at 3, ¶5.

MHL-6

In *Zamantakis v. Human Relations Commission*, 308 A.2d 612, 616 (Pa. Cmwlth. 1973) *(en banc) (Zamantakis)*, *aff'd*, *Pennsylvania Human Relations Commission v. Zamantakis*, 387 A.2d 70 (Pa. 1978), this Court set aside the Commission's award of damages for emotional distress as lacking statutory authorization.[7] We explained as follows:

> As so often happens in an administrative proceeding, the Commission and its employes are the investigators, the prosecutors, the judges and jury. On balance, this results in an unduly heavy force on the side of the proponents of Damages. *Traditionally, damages, in this Commonwealth, have been a matter for courts of law, under an adversary system of justice,* and therefore unless the Legislature clearly authorizes the Commission to award damages, we cannot extend to it such authority by judicial fiat, *nor can we broaden the scope of the Commission's authority into a full scale lawsuit.*

*Id.* at 616 (emphasis added). *Zamantakis* underscores that damages are "matters for courts of law, under an adversary system of justice." *Id.*

In the alternative, this Court held that the complainant's general and conclusory testimony was insufficient to support an award of $250 in damages for emotional distress. We explained that the Commission "seized upon one short (nine lines) statement of Willie Thorton, in the record, to the effect that he was 'upset' over being refused" a rental apartment. *Zamantakis*, 308 A.2d at 616. We observed that the "words 'humiliation' or 'mental anguish' are not found anywhere in the record except in the Commission's adjudication." *Id.* Thus, we concluded that even if there were statutory authority for the Commission's damage award, "the record in this

---

[7] Section 7 of the Act of December 20, 1991, P.L. 414, amended Section 9(f) of the Act to add, *inter alia*, the phrase "where the underlying complaint is a violation of Section 5(h) or 5.3, the Commission may award actual damages, including damages caused by humiliation and embarrassment" to the sentence. It also authorized, in a new subsection (2), the Commission's award of civil penalties.

case does not support [the] Commission's order." *Id*. This analysis of evidence has continued efficacy fifty years later.

The only evidence of Complainant's actual damages was her testimony. It follows:

Q. Do you have any emotional reactions to waiting for parking?

A. Yes.

Q. In what way?

A. Anxiety, depression, stress.

Q. Did you exhibit any symptoms as a result of waiting for parking?

A. Can you explain your question? I'm sorry.

Q. Did you have any physical reactions to waiting so long for parking?

A. Stress.

Q. Did waiting five years for parking affect your life in any other ways?

A. Yes.

Q. How so?

A. Because I had to wait [].

Hearing Transcript, 11/8/2023, at 33; R.R. 33a. As in *Zamantakis*, the words "humiliation" and "embarrassment" do not appear in her testimony. Likewise, Complainant's claim of "stress" is insufficient to prove emotional distress, just as a claim of being "upset" was found insufficient. *Zamantakis*, 308 A.2d at 616. Simply, Complainant's terse responses to the Commission's counsel's leading questions do not "support the Commission's order" imposing damages for emotional distress any more than they sufficed in *Zamantakis*. *Id*.[8]

---

[8] The majority charges the dissent with an "attack on [Complainant's] credibility" or "reassessment" thereof. *Reading Housing Authority v. Pennsylvania Human Relations*

MHL-8

Further, the Commission's damage award of $20,000 is excessive when compared to the damages awarded in other cases. In *New Corey Creek Apartments, Inc. v. Pennsylvania Human Relations Commission*, 865 A.2d 277 (Pa. Cmwlth. 2004), the Commission awarded $25,000 in compensatory damages to a complainant forced to endure the racial slurs of her landlord. In *Canal Side Care Manor, LLC v. Pennsylvania Human Relations Commission*, 30 A.3d 568 (Pa. Cmwlth. 2011), the Commission awarded $50,000 in damages to a complainant illegally evicted because of a disability who then spent time in a locked psychiatric unit until she could return to the personal care facility from which she was illegally evicted. A racial slur is intended to cause humiliation and embarrassment, and the public nature of an involuntary eviction has a high potential for humiliation and embarrassment.

The same cannot be said about the Authority's disciplined approach to the assignment of parking spaces to residents. The Authority did not intend and could not reasonably expect that treating all residents on the waiting list the same would cause any of them humiliation or embarrassment. The Authority believed that

_____

*Commission*, __ A.3d __ (Pa. Cmwlth., No. 907 C.D. 2024, filed December 11, 2025), slip op. at 18 fn.8. The dissent does neither. The dissent accepts Complainant's testimony as truthful. However, it is too elliptical and conclusory to support an award of damages for "non-economic losses such as humiliation, embarrassment, loss of reputation and mental anguish." *Bailets*, 181 A.3d 335.

In contrast, the complainant in *New Corey Creek Apartments*, 865 A.2d at 282, testified about how the racial slurs and being treated less than a human being caused emotional reactions, and she contemporaneously communicated these reactions to others. Their testimony confirmed her humiliation. Likewise, in *Bailets*, 181 A.3d 324, the plaintiff supported his claim for emotional distress with detailed testimony about the demeaning and humiliating conduct of his employer that led to his sleepless nights; the heartbreak of telling his family of his job loss; and the humiliation of using an unemployment card at the local grocery store. His testimony on humiliation was also confirmed by other witnesses.

Under the principle established in *Zamantakis*, 308 A.2d at 616, Complainant's testimony is inadequate as a matter of law to support the Commission's award of damages for emotional distress.

giving either Complainant or her husband a preference for a parking space would be unreasonable because the citywide resident association had opposed any change to the first-come/first-serve system of assigning parking spaces. The Authority was also concerned about unlawful discrimination against other residents. R.R. 139a.

Finally, as the Authority points out, it was Complainant's husband that walked to their parked vehicle, not Complainant. Her husband picked her up and dropped her off at or near the entrance of the apartment building when she left their residence. However, he was not a party to the discrimination complaint, and the distance he had to walk is irrelevant.[9]

I would reverse the Commission's award of $20,000 in damages. The Commission describes its award of damages as a "largely intuitive" exercise. Commission Adjudication at 18. The difficulty of conducting meaningful appellate review of the agency's exercise of intuition requires that the Commission's judgment be assigned little or no deference. Especially where, as here, the Commission has offered no explanation of how an award of $20,000 in damages for "vague descriptions of emotional distress, humiliation and/or embarrassment," Commission Guidance at 3, "will effectuate the purposes of the Act." 43 P.S. §959(f)(1).

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[9] Ironically, with an assigned parking space, Complainant will have to walk a little further, *i.e.*, beyond the door where she was picked up by her husband.

MHL-10